ALAN RANKIN, Franklin-Williamson Human Services, on behalf of Joe C. Heidlebaugh, Petitioner, v. JOHN HEIDLEBAUGH, Respondent-Appellant (Darlene Heidlebaugh, Respondent (Equip for Equality, Inc., *et al.*, Appellees).—*In re* GUARDIANSHIP OF JOE HEIDLEBAUGH, a Disabled Person (John Heidlebaugh, Petitioner-Appellant, v. Joe Heidlebaugh, Respondent (Equip for Equality, Inc., *et al.*, Appellees)).

Fifth District   No. 5—99—0615

Opinion filed April 13, 2001.

Richard J. Habiger, of Habiger & Associates, Edward J. Kionka, and Katherine M. Black, all of Carbondale, for appellant.

Diane I. Jennings, of Anderson, Bennett & Partners, and Karen I. Ward, of Equip for Equality, Inc., both of Chicago, for appellees.

PRESIDING JUSTICE CHAPMAN delivered the opinion of the court:

Joe Heidlebaugh was born with severe cerebral palsy and spastic quadriplegia, and he has severe motor disabilities. When Joe was one year old, he was abandoned and placed in foster care. Approximately 10 years later, John and Darlene Heidlebaugh, a deeply religious couple from southern Illinois, saw Joe on a television program and felt called to adopt him. It took the Heidlebaughs a year to locate Joe, but they persevered, and in 1982, when Joe was 13 years old, they adopted him.

The Heidlebaughs cared for Joe during his minority. They sent him to special education classes, and he graduated from that school in 1991. In addition to his physical disabilities, Joe is limited mentally. In Dr. Levinson's opinion, his development is far below age five. Joe was subsequently enrolled in a workshop located in West Frankfort, which Franklin-Williamson Human Services (FWHS) operated. A bus or van took Joe to the workshop in the morning and brought him home late in the afternoon. Joe's brother, Dexter, also has serious disabilities, and he attends the workshop along with Joe.

On the morning of May 22, 1996, Joe Heidlebaugh's parents, John

and Darlene Heidlebaugh, placed him on the bus so that he could be taken to the workshop he had been regularly attending for five years. Joe did not get off the bus that evening. Instead, the driver of the bus handed Darlene a note that said Joe would not be coming home. No one told John or Darlene where Joe had been taken. This case is about the necessity of sanctions for the conduct involved in these and related actions.

John Heidlebaugh is appealing from the trial court's denial of his motion for sanctions under Supreme Court Rule 137 (155 Ill. 2d R. 137). He contends that the trial judge (1) abused his discretion in declining to sanction Karen Kauffman and the two additional attorneys employed by Equip for Equality, Inc. (EFE), and (2) erred in finding he lacked the authority to sanction EFE. For the reasons that follow, we affirm in part and reverse in part, and we remand to the trial court the issue of the determination of the amount of fees and sanctions.

## FACTS

For some time before April 1996, the community support coordinator for FWHS had been speaking with the Heidlebaughs about placing Joe in a group home. The Heidlebaughs' response was always that they were able to take care of Joe but that if at some time in the future they were no longer able to do so, they would have a family discussion about placing Joe in a group home.

The Heidlebaughs received a letter from FWHS notifying them of a meeting to be held at 10 a.m. on April 11, 1996. The letter stated that the purpose of the meeting was "[t]o discuss Joe's services at Franklin-Williamson County and his goals for the future." However, an internal document, which was not furnished to the Heidlebaughs, stated that the purpose of the meeting was "[t]o discuss Joe moving out of current living situation into CILA home." Because the Heidlebaughs could not attend the meeting on that date, they spoke with an individual at FWHS and asked for the meeting to be rescheduled. The meeting was not rescheduled and was conducted in the Heidlebaughs' absence.

On May 22, 1996, Joe, without notice to the Heidlebaughs, filed a petition for an order of protection against the Heidlebaughs. In that petition, Joe identified himself as a "high risk adult with disabilities" as defined in the Illinois Domestic Violence Act of 1986 (750 ILCS 60/101 et seq. (West 1996)). The petition alleged that the Heidlebaughs had physically neglected Joe by not assisting him with proper hygiene. In addition, it alleged that the Heidlebaughs limited Joe's fluid intake and put Joe in his bedroom whenever he was not at the workshop. It

is undisputed that at no time before the filing of this petition for an order of protection had anyone from FWHS or EFE contacted Joe's parents to inform them that there was any problem or concern about any of the problems alleged in the petition. The petition also stated that Joe had been given temporary shelter at a location known to his caregivers. That location was not disclosed to the Heidlebaughs, although later it was found to be Independence Place and then Pathway House. The petition asked for an order prohibiting the Heidlebaughs from contacting Joe. The petition further alleged that the harm which the order of protection was intended to prevent "would be likely to occur if respondent were given any prior notice." Alan Rankin of FWHS signed the petition on the line provided in the petition for an attorney's signature.

The circuit court granted the order and stated that it would be in effect until 1:30 p.m. on June 10, 1996, when there would be a hearing. Darlene and John were served with copies of the order. Together they filed a *pro se* appearance on May 28. They requested an extension because their attorney was out of town. On June 6, 1996, Katherine Black filed her appearance for the Heidlebaughs.

On June 10, 1996, a hearing was called before Judge Phillip Palmer on the order of protection. At that time, Karen Kauffman, an attorney employed by EFE, successfully moved for her appointment as independent counsel to represent Joe's interests. EFE is a nonprofit corporation designated by the State of Illinois as the protection and advocacy agency for developmentally disabled persons. When she was appointed, Karen Kauffman stated to the court that she was very familiar with the background of the case. The Heidlebaughs' attorney had no objection to the appointment, and she presented a motion for a continuance so that counsel could conduct discovery and have Joe examined by a psychologist. In addition, the parties agreed that the temporary order of protection would be continued pending the hearing. Also on June 10, John filed a petition to be appointed Joe's guardian. EFE, represented by Karen Kauffman, opposed the petition. On July 11, Judge Paul Murphy entered a 30-day interim order of protection. That order expired August 17, and subsequently the judge entered a docket entry stating that it had expired.

On September 27, 1996, both John's guardianship petition and EFE's counterpetition, which asked that the court appoint the Office of State Guardian as Joe's guardian, were called for a hearing before Judge Murphy. A three-day evidentiary hearing was held, with testimony from psychologists, physicians, family and friends, Joe's parents, and Joe's caregivers from both the workshop and the group home.

The evidence completely destroyed any argument that Joe was capable of making choices for himself. In addition, although credible evidence of Joe's less-than-optimal level of cleanliness was presented, there was absolutely no credible evidence of abuse, of Joe being kept locked in his room for all his time at home, or of Joe being improperly limited as to the amount of food and drink he could have. In short, there was absolutely no evidence that any order of protection was ever required. In addition, neither Alan Rankin nor any other employee of FWHS who testified had ever spoken with John and Darlene about the alleged substandard level of care he was receiving at their home prior to the petition being filed. Finally, the evidence established that when Joe was taken from John and Darlene, Pathway House began receiving well over $2,000 per month from the state for Joe's support while he lives there. In addition, Pathway House received Joe's SSI and Social Security checks.

At the close of the evidence, Judge Murphy orally chastised both FWHS and EFE for many of the actions taken during both the order of protection and the guardianship proceedings. On October 10, Judge Murphy issued his ruling in letter form. The letter stated the court's intention to appoint John as Joe's guardian, and again the judge chastised the agencies for their actions. On November 7, the order appointing John as guardian was entered, and John removed Joe from the group home. On December 3, Steven Mills and Janet Cartwright, attorneys employed by EFE, filed an entry of appearance as cocounsel for Joe and a motion for the modification of the order appointing John guardian. On December 23, John filed a notice of appeal from the denial of the motion for attorney fees that he had filed in both the order-of-protection case and the guardianship proceeding. The appellate court dismissed both appeals because of the lack of an appealable final order. After some further orders were filed in the trial court, John again appealed from the denial of his motion for sanctions.

## ANALYSIS

This case presents the question of whether the trial court's refusal to impose sanctions was an abuse of discretion. The sanctions were sought (1) against an attorney of record, (2) against EFE, an employer of that attorney, who, it is argued, could also be considered as an attorney of record or a party, and (3) against two attorneys also employed by the same employer who had minor involvement at the end of the proceedings.

■ Rule 137 states that both the parties and the attorneys have an affirmative duty to conduct an inquiry of the facts and the law before filing an action, pleading, or other paper and that the failure to make

such an inquiry could subject them to sanctions. 155 Ill. 2d R. 137; see *Amadeo v. Gaynor*, 299 Ill. App. 3d 696, 700, 701 N.E.2d 1139, 1142-43 (1998). The rule requires a party or litigant to (1) sign pleadings and other papers to certify that he or she has read the document, (2) make reasonable inquiry into its basis, (3) believe that it is well grounded both in fact and in law or that there is a good-faith argument for the extension, modification, or reversal of existing law, and (4) not interpose it for any improper purpose, such as harassment, unnecessary delay, or needless increase in the cost of the litigation. 155 Ill. 2d R. 137.

■ The purpose of Rule 137 is to prevent the abuse of the judicial process by penalizing those who bring vexatious or harassing actions without sufficient foundation. *Amadeo*, 299 Ill. App. 3d at 701, 701 N.E.2d at 1143. This rule is penal in nature and must be strictly construed. *Amadeo*, 299 Ill. App. 3d at 701, 701 N.E.2d at 1143. A trial court's decision whether to impose sanctions will not be reversed absent an abuse of discretion. *Amadeo*, 299 Ill. App. 3d at 701, 701 N.E.2d at 1143. This standard of review, however, does not prevent the appellate court from independently reviewing the record and finding an abuse of discretion if the facts so warrant. *Walsh v. Capital Engineering & Manufacturing Co.*, 312 Ill. App. 3d 910, 914, 728 N.E.2d 575, 578-79 (2000).

### 1. Sanctions Against EFE and Karen Kauffman

FWHS notified Karen Kauffman of Joe's situation on April 11, 1996. She met with Joe on April 17. On May 22, Joe, with the help of Alan Rankin, filed the *"pro se"* petition for order of protection. Karen Kauffman argued in her brief that she did not become "attorney of record" until June 10, when she was appointed. However, she began acting as Joe's counsel the moment she began advising him, and FWHS, of what steps to take in this case in mid-April. The Heidlebaughs' attorney acknowledged this fact by providing service to Karen Kauffman on June 5, prior to her appointment as Joe's counsel. Even Karen Kauffman, herself, acknowledged her prior involvement in the case when she explained to the court upon being appointed Joe's counsel that she was very familiar with the case. These facts support the conclusion that Karen Kauffman was acting as the attorney when the original petition for order of protection, with its numerous misstatements of fact, was filed.

What could FWHS have done instead of filing for an emergency order of protection? What alternative methods were available that they could have been advised of by Karen Kauffman? It could have been advised to tell Joe's parents of their concern about his hygiene

and the other problems. It could have been advised that Joe's parents should be told that the April 11 meeting was to discuss moving Joe. It could have been advised that, if Joe's parents were unwilling to cooperate, a petition to appoint a guardian would be filed. Apparently, FWHS was advised of none of these alternatives and was instead advised to file for an emergency order of protection that accused Joe's parents of the following: "Respondent has engaged in physical neglect such as not assisting petitioner with proper hygiene, [wheel]chair unwashed, clothing soiled by feces, ears have been found to be dirty. Petitioner has been limited by respondent in terms of fluid intake. Respondent has put petitioner in bedroom for all of hours outside of Franklin-Williamson workshop." In addition, the petition prayed for an order prohibiting Joe's parents from committing any of the following: physical abuse, willful deprivation, harassment, neglect, interference with personal liberty, exploitation, and stalking.

The only act of misconduct contained in the preprinted petition that Joe's parents were not prohibited from committing was the intimidation of a dependent. Apparently this was eliminated so that EFE could be consistent in its position that, since Joe had not been the subject of a guardianship proceeding, he was presumed competent to make all his own choices and to file for an order of protection on his own.

The trial court's conclusion about the use of this procedure is instructive:

> "This case was flawed from the start. It began in the courts with a Petition for Order of Protection alleging domestic abuse by the parents, John and Darlene Heidlebaugh, against their alleged disabled adult son Joe in [No.] 96—OP—133. The allegations, prepared by Alan Rankin *as attorney* for Joe C. Heidlebaugh and purportedly signed and sworn by Joe himself, included allowing Joe to sit in his soiled pants, isolating Joe for 18 hours per day in his bedroom[,] and denying him water. These allegations under oath certainly cried out for judicial intervention[,] and[ ] without notice to his parents, said parents were ordered to stay away from Joe. The problem was [that] the allegations turned out to be substantially unfounded.
>
> Based upon misstatements of fact, Joe's parents were denied any knowledge of his whereabouts for three weeks[,] during which time they retained counsel, filed for guardianship herein[,] and appeared in [No.] 96—OP—133.
>
> The real theory behind the actions of counsel for Equip for Equality, Inc., and the actions of the various care provider entities before and after May 22, 1996, the date of the petition for order of protection, was *not* abuse of Joe by his parents[ ] but Joe's assumed abil-

ity to control his destiny by making his own choices as to where he wanted to live, without assistance of parent or guardian. Joe, it is argued, is 27, an adult, and is untethered by quaint notions of family ties, even though he needs help with everything. These same care providers had many times before sought consent from these same parents. The parents were informed of their change in status first by a bus driver handing them a message, 'Joe's not coming home today[ ]', and later by service of the Order of Protection.

Thus, the strategy of pursuing the Order of Protection was exposed, at trial of this cause, as nothing less than a premeditated preemptive strike at the parents by counsel and Mr. Rankin because they knew that when they acted on one's 'choice' to move away from home[,] that [sic] the parents would not sit still for it. They knew that the law would be needed to block John and Darlene from the exercise of their rights in the matter. They knew that the exercise of *any other legal option* other than an Order of Protection by those seeking to remove Joe would have required *prior notice* to the parents. Said prior notice (a/k/a 'due process of law' in our constitution) would have triggered Ms. Black's appearance and prevented a finding of abuse in the OP case.

The abuse that occurred here was abuse of process and abuse of the purpose for which orders of protection are allowed. It is shocking that in the pursuit of the respect of rights for the disabled and the handicapped that professional persons and care providers so sensitive to such rights could so consciously steamroll the rights of the parents.

The notion that Joe Heidlebaugh should be presumed to be a free agent capable of managing his own affairs is simply preposterous. Both physicians in this case agree he functions mentally like a three[-] or four[-]year[-]old. That rational adults with access to his medical and social history and his everyday life experiences could conclude they had the superior right[,] without the blessing of a court, to assist Joe in 'firing' his parents, and in changing his doctor, his religious practices, his residences, *his money*, his diet, etc., manifests a colossal audacity. ***

*** But that was just the beginning of this travesty. Attorney Kauffman at every stage of these legal proceedings resisted Ms. Black's attempts to obtain medical records which the *parents themselves were responsible for creating*[ ] and which she knew or should have known *were relevant* to this case. She did not counterpetition that anyone else be appointed Joe's guardian until the day of trial. Court[-]ordered medical appointments were postponed more than a month without good cause or leave of court first obtained. Procedural roadblocks were strewn in Ms. Black's path to the obvious truth: that Joe is mentally incompetent and needs a guardian.

The testimony of Dr. Smith totally destroyed the abuse theory. Dr. Smith's views were made available to Joe's care providers in writing. The reaction? Get another doctor!! Dr. Levinson's testimony and that of Dr. Smith made laughable the notion that poor Joe can think for himself without a guardian. A 'visually challenged' judge could see that in a minute. Ms. Black's cross[-] examination eviscerated any notion that the motives of Ron Mertz and Alan Rankin were pure.

It is not that respondent's witnesses don't care for Joe. They obviously do! It is their arrogant attitude to the parents that has them in trouble. Not to mention their arrogant attitude to the courts! Fine when the court, without notice to parents, helps them take Joe from his family. But when that same court is used to seek medical records on behalf of the parents to prove the obvious fact that their disabled son is in fact disabled, *then and only then do they* have to get a lawyer to postpone, to obscure, to delay said discovery and to intimidate those seeking to use this court to get to the truth. *They should seek to hide those records because those records expose the weakness of the legal theory on which they based their actions* (abuse by John and Darlene, and legal competence of Joe)[,] *as well as the degree of their premeditation.* The court has seldom witnessed more devastating use of records to cross[-] examine witnesses that [*sic*] was done by Attorney Black in this case.

Only after some brilliant work by Ms. Black does respondent belatedly argue that, yes, Joe does need a guardian. But[ ] it is further argued he needs a guardian who will ratify their misdeeds. The Court is belatedly directed by Attorney Kauffman to consider all the 'good' things that have happened to Joe since he's been away from home. Joe loves the whirlpool at the group home, they say. Joe loves the family atmosphere at the group home. Joe is *so* upset about what the Court might do. How does he know so much about the Court? Why did he want so badly to talk to the judge? Whose interests does it serve to keep him upset about it? Certainly not John Heidlebaugh's. Where was this group home and where were these care givers 15 years ago when John Heidlebaugh sought out Joe—then abandoned by his own birth parents and languishing in a foster home? For the crime of not being the best care giver-parent in the area, John is given a legal lynching by those who ought to know better." (Emphasis in original.)

What was the effect of this petition for an order of protection and the order that allowed it? The effect was to remove Joe from the home of his parents, parents who had spent a year searching for him in order to adopt him and another year in the adoption process. These parents, who had adopted a severely disabled child and raised him for the next

14 years, were not informed of (a) any problem with Joe's hygiene or any of the other alleged problems set out in the petition or (b) the true purpose of the April 11, 1996, meeting, which was, of course, to take Joe from them and put him in a group home. They were not even given the courtesy of a phone call from Mr. Rankin or anyone from FWHS. Instead, they were handed a note by the bus driver, and that was that. Their son was gone; they knew nothing more, neither where nor why.

What was the effect of this action? According to the uncontroverted testimony, it was devastating both to Joe's parents and to Joe. Because his parents were forbidden to contact him, Joe felt they had abandoned him.

This travesty did not end with the entry of the order of protection; it continued throughout these proceedings. For example, after Joe's parents were informed of his location at Pathway House, Joe's father went to visit him, and obviously, they were happy to see one another after a separation of almost four months. Joe's father told the people at Pathway House that he would be back the next day to see his son. When he returned, he was told that they had checked with the lawyer, and he would not be allowed to see his son on a daily basis, but only once a week. John told them he would return the following week and he did, and again he was turned away. This time he was told that he should have called that day to tell them he was coming to visit. This episode in September should be coupled with certain activities in April that were testified to by Alan Rankin, the FWHS representative. Mr. Rankin testified that in April 1996, Karen Kauffman had checked out the existence of a possible guardianship over Joe in several jurisdictions and had told him that there were none. In addition, he testified that in either April or May 1996, Karen Kauffman had advised Joe of his rights. These incidents in April and/or May 1996 strongly suggest that Karen Kauffman was acting as Joe's attorney before her appointment on June 10, 1996. The September incident equally strongly suggests that her involvement in preventing Joe's parents from seeing him continued well past the time the court had allowed visitation.

Another statement by the trial court about the conduct of Karen Kauffman and EFE may be appropriate at this point:

> "The nub of this petition[-]for[-]fees[-]and[-]sanctions case is that Attorney Kauffman and Equip for Equality, Inc., acted in a high[-]handed manner in pursuit of what they perceived as Joe's rights. They arrogantly presumed the very issue to be decided: Joe's capacity to decide matters for himself.
>
> In their self-righteousness they initiated legal proceedings against Joe's parents. In theory, they were acting as Joe's lawyer. Funded

by others, they caused Joe's parents to expend thousands of dollars to defend a position the parents had held for years without benefit of the Courts: that of Joe's guardian.

Either or both Equip for Equality, Inc., and Attorney Kauffman concluded that they had the ability, sua sponte[ ] (or upon the instructions of a 26[-]year[-]old with the admitted mental capacity of below five years old)[,] to hold themselves out as Joe's lawyer. As to Ms. Kauffman, as a lawyer she is presumed to be familiar with ethical Rule 7.3(b)(1)[,] and under the facts of this case, under Rule 137 she probably could be sanctioned for violating it.

'(b) In no event may a lawyer solicit a prospective client if:

 · (1) the lawyer reasonably should know that the physical or mental state of the person is such that the person could not exercise reasonable judgment in employing a lawyer.' [134 Ill. 2d R. 7.3(b)(1).]

Furthermore, there was stealth in the way they proceeded. They waited until Joe was away from home. They filed for an Emergency Order of Protection, on very weak grounds, and thereby wrested physical control of Joe from his parents. While litigation was pending about Joe's competence, they again presumed the issue to be decided by directing Joe's money from his parents to other care providers without aid of Court.

Until the day of trial, Attorney Kauffman and Equip for Equality[ ] resisted the notion that Joe lacked capacity to decide things for himself. Joe's incapacity (physical and mental) is so patently obvious that no trier of fact could possibly conclude that Joe is not incapacitated, that he is not in need of a guardian.

Thus only after needless and expensive pre[ ]trial maneuvering did Attorney Kauffman finally agree at trial that Joe needed a guardian but it should be someone other than his parents. The medical evidence presented overwhelming [*sic*] favored Joe's parents. Nothing approaching abuse or justifying removal of Joe from his parents was apparent from the evidence presented.

Attorney Kauffman defends her actions as zealous representation of her client. The fact that she is employed by an organization established to protect the interests of the disabled does not empower her to file appearances on behalf of anyone she chooses. Because she is an advocate for the disabled, it was illogical and surprising that she steadfastly maintained, in the face of overwhelming evidence, that Joe had the capacity to retain her, to choose where he would live, who should get to spend his money, etc. He obviously had no such mental capacity. Her proper course was to represent a person or entity willing to be Joe's guardian and to seek their appointment as guardian. By claiming to be Joe's lawyer directly[,] she bypassed such niceties as due process and

fact finding, not to mention the probate act, and the implied primary rights of a parent in such situations."

The trial court's disapproval of the conduct of Karen Kauffman and EFE is clearly apparent from the excerpts of the letter orders we have quoted. Why then did the trial court refuse to enter sanctions? With regard to EFE, the trial court specifically stated:

"Assuming the Court had the authority to sanction Equip for Equality, Inc., it would not hesitate to do so. *** But Rule 137 is for lawyers and does not apply to them."

Although we are cognizant of the trial court's concern that it was unable to sanction EFE because EFE was neither a lawyer nor a party, we conclude that the court was not so powerless for several reasons. First, the driving force behind all these proceedings was EFE. The face of the petition for the order of protection lists only Joe Heidlebaugh as the petitioner. Theoretically, only Joe could be sanctioned as a party, but Joe quite clearly did not have the mental capacity either to frame the allegations of the petition or to choose that method of proceeding. Who was the real party in charge of the proceedings? When this record is viewed in its entirety, it is clear that the entity in charge, both in the order of protection proceeding and in the guardianship proceeding, was EFE. Who represented EFE? Karen Kauffman.

John Heidlebaugh contends not only that EFE was the entity in charge but also that EFE should be estopped from contending that it was not acting as an attorney because EFE repeatedly asked to be recognized as counsel. On June 10, 1996, Karen Kauffman filed a motion for appointment of independent counsel in which she set out EFE's position as an advocacy agency for developmentally disabled persons and then asked: "WHEREFORE, EQUIP FOR EQUALITY, INC., by Karen Odell Kauffman, respectfully moves that Equip for Equality, Inc. be appointed *independent counsel* for Joe E. Heidlebaugh, a high risk adult with disabilities." (Emphasis added.) In addition, there are several pleadings signed by Karen Kauffman that begin, "Comes now Joe C. Heidlebaugh through Equip for Equality, Inc., by Karen Odell Kauffman, and moves this court to ***." Finally, on July 2, 1996, Karen Kauffman stated in a motion to strike, "[T]he only contact or involvement by Karen Odell Kauffman *or Equip for Equality, Inc.* with any of the parties to this action has been as pro bono *legal counsel* to Petitioner, Joe C. Heidlebaugh." (Emphasis added.)

■ In view of EFE's request to be appointed counsel and its repeated filing of pleadings in which it appeared to be acting as counsel, the estoppel argument is persuasive, but we conclude that EFE is subject to sanctions under Supreme Court Rule 137 because of its position as Karen Kauffman's employer. A principal is liable for the

acts of its agent committed within the scope of her authority. *Brubakken v. Morrison*, 240 Ill. App. 3d 680, 608 N.E.2d 471 (1992). *Brubakken* upheld the entry of sanctions against the law firm that employed the lawyer who committed the sanctionable conduct. Similarly, we conclude that EFE is responsible as principal for the sanctionable conduct of its agent, Karen Kauffman.

■ Next, we turn to the trial court's refusal to impose sanctions on Karen Kauffman. The trial judge gave two reasons for his reluctance to sanction Karen Kauffman, even though he strongly disapproved of her conduct. First, he felt that her actions were motivated by a good-faith, zealous representation of her client. Second, he felt that her youth and inexperience mitigated against the imposition of sanctions.

Good faith alone is not a defense to sanctionable conduct. An objective standard of reasonableness based upon the entirety of the circumstances must be applied. *In re Marriage of Irvine*, 215 Ill. App. 3d 629, 638, 577 N.E.2d 462, 468 (1991).

Judge Murphy stated, "By claiming to be Joe's lawyer directly, [Karen Kauffman] bypassed such niceties as due process and fact finding, not to mention the probate act, and the implied primary rights of a parent in such a situation." Such actions could not have been taken if she had made a reasonable inquiry into whether they were well grounded in fact and law or as a good-faith argument for the change of existing law.

Even if the reasonable-inquiry requirement could have been met when the petitions were originally filed, it could not be met after the evidence was presented. Rule 137 contains an implicit requirement that an attorney promptly dismiss a lawsuit once it becomes evident that it is unfounded. See *Cmarko v. Fisher*, 208 Ill. App. 3d 440, 446, 567 N.E.2d 352, 355 (1990). A violation of this continuing duty of inquiry is sanctionable. Once Karen Kauffman recognized that, as Judge Murphy stated, "[n]othing approaching abuse or justifying removal of Joe from his parents was apparent from the evidence presented," she had a duty to dismiss the petition for the appointment of guardian or else she risked the possibility of sanctions.

Also, although it is true that courts have taken age and experience into consideration, in this case we believe that it is improper to deny sanctions solely on that basis. Most often, courts rely on this youth-and-inexperience defense in disciplinary proceedings. However, none of Karen Kauffman's sanctionable conduct appears to be because of mistakes of judgment made by a neophyte lawyer. First, by 1996 she had been licensed for five or six years. In addition, the conduct consists of specific maneuvers, stealthily accomplished, in an attempt to further the goals of the agency. Therefore, for the aforementioned

reasons, we conclude that the trial court abused its discretion in denying John's motion for sanctions against Karen Kauffman.

We recognize that a trial court has discretion in determining whether sanctions should be applied. The discretion, however, is not unlimited, and a number of cases have reversed the denial of sanctions by the trial court. *Pritzker v. Drake Tower Apartments, Inc.*, 283 Ill. App. 3d 587, 670 N.E.2d 328 (1996); *Fremarek v. John Hancock Mutual Life Insurance Co.*, 272 Ill. App. 3d 1067, 651 N.E.2d 601 (1995); *Wittekind v. Rusk*, 253 Ill. App. 3d 577, 625 N.E.2d 427 (1993).

### 2. Sanctions Against Steven Mills and Janet Cartwright

On appeal, a contention that is supported by some argument but absolutely no legal authority does not meet the requirements for consideration. *In re Tally*, 215 Ill. App. 3d 385, 390-91, 574 N.E.2d 1262, 1265 (1991). John's argument for the sanctioning of Steven Mills and Janet Cartwright lacks any authority whatsoever. Therefore, we conclude that John's argument does not merit consideration, and we affirm the trial court's denial of sanctions against them.

### CONCLUSION

For the above reasons, we affirm the judgment of the trial court with regard to Steven Mills and Janet Cartwright, and we reverse with regard to Karen Kauffman and EFE. We remand to the trial court for a determination as to the amount of fees and sanctions to be paid by Karen Kauffman and EFE.

Affirmed in part and reversed in part; cause remanded.

HOPKINS and GOLDENHERSH, JJ., concur.