**NOTICE**

Decision filed 02/28/07. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-05-0474

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| CECIL V. CRETTON and CHERYL L. CRETTON, Coadministrators of the Estate of Joyce E. Cretton, Deceased, | ) Appeal from the<br>) Circuit Court of<br>) St. Clair County.<br>) |
|    Plaintiffs-Appellees, | )<br>) |
| v. | ) No. 00-L-64<br>) |
| PROTESTANT MEMORIAL MEDICAL CENTER, INC., d/b/a Memorial Hospital of Belleville, | )<br>) Honorable<br>) Robert P. LeChien, |
|    Defendant-Appellant. | ) Judge, presiding. |

_____

JUSTICE SPOMER delivered the opinion of the court:

The defendant, Protestant Memorial Medical Center, Inc., doing business as Memorial Hospital of Belleville, appeals the following orders of the circuit court of St. Clair County entered against the defendant and in favor of the plaintiffs, Cecil V. Cretton and Cheryl L. Cretton, who are the coadministrators of the estate of Joyce E. Cretton, who is deceased: the August 14, 2003, order entering a judgment in the amount of $950,000 on a jury verdict rendered the previous day for the plaintiffs on their survival action against the defendant; the March 7, 2005, order awarding sanctions in the amount of $129,089.90 against the defendant; and the July 18, 2005, order denying the defendant's motion for a judgment notwithstanding the verdict (*n.o.v.*), a new trial, a remittitur, and/or the vacation of the March 7, 2005, sanctions. For the reasons that follow, we affirm the orders of the circuit court.

On February 11, 1999, Joyce Cretton, who was in the advanced stages of chronic obstructive pulmonary disease (COPD), was admitted to the defendant hospital. Although she was initially treated in the intensive-care unit, Joyce was later transferred to the

1

intermediate-care unit. Joyce's condition deteriorated on February 26 and 27, and she passed away on February 27, 1999. On February 3, 2000, the plaintiffs filed a two-count complaint against the defendant, alleging that prior to her death, Joyce had been allowed to fall or was dropped and that as a result Joyce suffered a subdural hematoma that ultimately resulted in her death. Eventually, the case proceeded to a trial and led to the orders described above. Although the plaintiffs prevailed on their survival action, the jury rendered a verdict–from which the plaintiffs do not appeal–for the defendant on the plaintiffs' wrongful death action.

On appeal, the defendant raises eight issues, arguing that (1) the trial court erred in denying the defendant's motion for a judgment *n.o.v.* and alternative motion for a new trial on the survival action, (2) discovery sanctions entered by the trial court during the trial were unwarranted and prejudicial, (3) the improper appearance of judicial partiality requires a new trial, (4) errant evidentiary rulings require a new trial, (5) prejudicial and inappropriate comments by counsel for the plaintiffs during the trial and in closing argument require a new trial, (6) cumulative error mandates a new trial, (7) sanctions entered after the trial were in error, and (8) the amount of the posttrial sanctions was in error. Because of the number of issues and subissues involved in this appeal, additional facts will be provided and discussed as needed throughout this opinion.

On appeal, the defendant first argues that the trial court erred in denying the defendant's motion for a judgment *n.o.v.* and alternative motion for a new trial on the survival action. We begin by reciting our standard of review.

"A judgment [*n.o.v.*] should not be granted unless the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favored the movant that no contrary verdict could possibly stand. *Pedrick* [*v. Peoria & Eastern R.R. Co.*], 37 Ill. 2d [494,] 510 *** [(1967)]. A judgment [*n.o.v.*] is inappropriate in situations where ' "reasonable minds might differ as to inferences or conclusions to be drawn

2

from the facts presented." ' *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 *** (1999), quoting *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 *** (1995). The trial court should not reweigh the evidence and set aside a verdict just because the jury could have drawn different conclusions or inferences from the evidence or because the court feels that another result would have been far more reasonable. [Citations.] Similarly, the appellate court should not usurp the jury's role on questions of fact that were fairly submitted, tried, and determined from the evidence which did not overwhelmingly favor either position. [Citations.] On review, we apply a *de novo* standard to determinations on motions for judgments [*n.o.v.*]. [Citation.]" *Koehler v. Neighbors*, 322 Ill. App. 3d 440, 445-46 (2001).

On a motion for a new trial, the trial court should weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). " 'A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary[,] and not based upon any of the evidence.' [Citations.]" *Maple*, 151 Ill. 2d at 454. Whether to grant a motion for a new trial is addressed to the sound discretion of the trial court, and the trial court's ruling on such a motion will not be reversed "except in those instances where it is affirmatively shown that it clearly abused its discretion." *Maple*, 151 Ill. 2d at 455. "In determining whether the trial court abused its discretion, the reviewing court should consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial. [Citation.] Furthermore, it is important to keep in mind that ' "[t]he presiding judge[,] in passing upon the motion for new trial[,] has the benefit of his previous observation of the appearance of the witnesses, their manner in testifying, and of [*sic*] the circumstances aiding in the determination of credibility." ' [Citations.]" *Maple*, 151 Ill. 2d at 455-56.

3

In this case, the defendant contends the "uncontradicted evidence" presented at the trial so overwhelmingly favored the defendant on the issue of the causation of Joyce's physical pain and suffering prior to her death that the jury's verdict and damages should be reversed or, alternatively, that at the very least the verdict is against the manifest weight of the evidence and a new trial should be ordered. To adequately address the defendant's argument, we must first consider the parameters of an award of damages for pain and suffering in an action brought pursuant to the Survival Act (755 ILCS 5/27-6 (West 2002)). "A survival action allows for the recovery of damages for injuries sustained by the deceased up to the time of death." *Ellig v. Delnor Community Hospital*, 237 Ill. App. 3d 396, 401 (1992). Such an action preserves the right of action for a personal injury that accrued before the death of the injured person and preserves causes of action relating to, *inter alia*, prolonged pain and suffering, which would otherwise be extinguished upon the injured party's death. *Ellig*, 237 Ill. App. 3d at 401. When determining whether the decedent experienced conscious pain permitting a recovery pursuant to the Survival Act, a jury may consider evidence regarding a decedent's injuries. *Hall v. National Freight, Inc.*, 264 Ill. App. 3d 412, 427 (1994). "It is not required that medical testimony be offered to establish conscious pain and suffering where lay testimony describing a decedent's actions prior to death[,] coupled with evidence concerning [the decedent's] injuries[,] is sufficient to support a recovery. [Citation.] In making such a determination, an important factor is evidence indicating that the decedent was conscious prior to death. [Citation.] Therefore, damages for conscious pain and suffering may be sustained where the decedent was shown to have been conscious prior to death and there is evidence from lay witnesses regarding what took place prior to the cessation of consciousness. [Citation.]" *Hall*, 264 Ill. App. 3d at 427-28.

Turning again to the defendant's argument, we cannot agree with the defendant's contention that "uncontradicted evidence" was presented at the trial on the issue of the

4

causation of Joyce's physical pain and suffering prior to her death. In fact, although the defendant presented evidence that the pain and suffering could have resulted from Joyce's COPD, rather than from the negligence of the defendant in allowing Joyce to fall or be dropped, the plaintiffs presented evidence that contradicted the defendant's theory and that pointed to the defendant's negligence as the cause of the pain and suffering. Specifically, the plaintiffs presented, *inter alia*, the testimony of Dr. Harry Parks, by discovery deposition, that when he conducted an autopsy on Joyce following her death, he found evidence of a brain injury caused by a "significant" blow to the back of Joyce's head and that the brain injury, which he confirmed was a subdural hematoma commonly referred to as a "contrecoup injury," rather than COPD, caused Joyce's respiratory distress and ultimately her death. In addition, Dr. Douglas Dothager, Joyce's treating pulmonologist, testified to the pain and suffering accompanying Joyce's respiratory distress, agreeing that when he examined Joyce in the hours before her death, he saw in her face that "she was frightened for her own life and whether she would make it." Furthermore, Cheryl Cretton, Joyce's daughter, testified that in the hours before her mother's death, Cheryl observed Joyce experiencing anxiety, difficulty in breathing, "gasping for air," difficulty communicating, and difficulty keeping her eyes open.

Clearly, the defendant's allegation to the contrary notwithstanding, evidence was presented at the trial from which a reasonable jury could find for the plaintiffs regarding the causation and existence of Joyce's physical pain and suffering prior to her death. Indeed, although the defendant takes issue in particular with the testimony of Dr. Parks, the defendant's objections go to the weight to be accorded to his opinion, not to its admissibility. In fact, no cogent argument is provided by the defendant questioning the admissibility of Dr. Parks's opinions. Accordingly, we decline to usurp the jury's role on this question of fact that was fairly submitted, tried, and determined from evidence which does not overwhelmingly

5

favor either position. See *Koehler v. Neighbors*, 322 Ill. App. 3d 440, 445-46 (2001) (citing *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999)). Likewise, we decline to conclude that the trial court abused its discretion in denying the motion for a new trial where, as here, the jury's verdict was supported by the evidence and the losing party was not denied a fair trial. See *Maple v. Gustafson*, 151 Ill. 2d 445, 455 (1992). We conclude the trial court did not err when it denied the defendant's motion for a judgment *n.o.v.* and alternative motion for a new trial on the survival action.

Although the defendant mentions in passing in its opening brief that the amount of damages awarded by the jury on the plaintiffs' survival action ($950,000) was almost twice the amount suggested by counsel for the plaintiffs in closing argument as an appropriate recovery ($500,000), the defendant does not develop any cogent argument in its opening brief that, assuming an award of damages was permissible, the amount awarded was excessive, and accordingly it has waived a consideration of that argument by this court. See Official Reports Advance Sheet No. 12 (June 7, 2006), R. 341(h)(7), eff. Sept. 1, 2006 (points not argued in an opening brief are waived and shall not be raised in the reply brief, in oral argument, or in a petition for rehearing). Accordingly, having found an award of damages to be permissible, we decline to disturb the amount of damages awarded by the jury.

The defendant next argues that discovery sanctions entered by the trial court during the trial were unwarranted and prejudicial. "Supreme Court Rule 219(c) (166 Ill. 2d R. 219(c)) authorizes a trial court to impose a sanction on a party who unreasonably fails to comply with the court's discovery rules or orders. [Citation.] The trial court has discretion to impose a particular sanction, and its decision will not be reversed absent a clear abuse of discretion. [Citation.]" *In re Marriage of Booher*, 313 Ill. App. 3d 356, 359 (2000). In the case at bar, the defendant argues that the sanctions entered against it were for conduct that was not sanctionable and that the sanctions themselves were excessive. To adequately

6

understand the sanctions entered, a description of additional facts is necessary. As alluded to above, one of the principal issues in the trial involved the allegation, by the plaintiffs, that Joyce had been allowed to fall or was dropped and that as a result Joyce suffered a subdural hematoma that ultimately resulted in her death. At the trial, Cheryl Cretton testified that on February 25, 1999, her mother, Joyce, called Cheryl from the hospital and asked Cheryl to come there. At the hospital, Joyce told Cheryl that the previous night, staff members had dropped Joyce and let her fall to the floor while attempting to transfer her from one bed to another. Cheryl further testified that after Joyce told her this, Cheryl confronted two nurses she saw standing in the hallway about the alleged drop or fall and was directed by those nurses to nursing supervisor Phil Schorfheide. Cheryl then recounted to Schorfheide what she had learned from Joyce, and Schorfheide said he would look into the allegation. However, Cheryl received no follow-up information from Schorfheide, nor was any entry made in Joyce's medical record concerning the alleged drop or fall.

On September 25, 2001, the deposition of Schorfheide was taken. During the course of the deposition, Schorfheide was asked if, prior to Joyce's death, he had, *inter alia*, prepared any handwritten notes with respect to Joyce. Schorfheide answered that he had noted a conversation he had with Cheryl about "some concerns" Cheryl had. Moments later, as Schorfheide attempted to answer a follow-up question about his conversation with Cheryl, he was interrupted by the defendant's trial counsel, who informed counsel for the plaintiffs he believed that Schorfheide was "getting into" matters Schorfheide had been asked to do as a part of a quality management council subcommittee review and that accordingly he was going to invoke the protection of the medical studies statute (735 ILCS 5/8-2101 *et seq.* (West 2000)) and instruct Schorfheide not to answer any questions about documents Schorfheide might have authored as a part of that review. Several minutes later, counsel for the plaintiffs asked Schorfheide the following question: "Did [Cheryl] say anything to you

7

about her mom having been dropped or having fallen?" Schorfheide answered "No." Several follow-up questions were asked to ascertain whether Schorfheide had ever received a report of the alleged drop or fall, all of which Schorfheide responded to, with the defendant's trial counsel at his side, in the negative.

On October 9, 2001, shortly after the Schorfheide deposition, the defendant filed the affidavit of defendant's employee Kerry Wrigley, who was the quality improvement coordinator at the defendant hospital. The affidavit averred that the peer-review process to which the defendant's trial counsel had referred during Schorfheide's deposition had been initiated "on or about March 3, 1999," and that the privileged documents to which the defendant's trial counsel had referred were "notes by an unknown author."

On July 31, 2003, days before the trial began, the trial court, at the request of the plaintiffs, conducted an *in camera* review of the documents for which the defendant claimed a privilege. During that review, the court found what it described as "a summary prepared by nurse supervisor Schorfheide that flatly contradicted his sworn deposition testimony." Specifically, a review of the record demonstrates that the trial court's *in camera* review revealed that the document to which the defendant's trial counsel had referred when he claimed privilege and instructed Schorfheide not to answer questions about his conversation with Cheryl–a two-page document found at pages 21 and 22 of the privilege log that was filed by the defendant on July 17, 2001–was the same document that, a mere two weeks after the deposition, Wrigley had averred had been created by an author unknown. In addition to this inconsistency, a review of the document reveals that it clearly states that the author of it had been told by Cheryl of the alleged drop or fall. Furthermore, portions of the document that apparently still have not been revealed to the plaintiffs mention, by name, other employees of the defendant to whom the author of the document spoke on February 26 and 27 about Joyce's condition. Given this information–and the fact that the name "Phil" is

8

visible at the bottom of the document–Wrigley's averment that the author of the document was unknown is unbelievable on its face, for even if Wrigley had somehow overlooked the name "Phil" at the bottom of the document–a grave enough mistake for one preparing a sworn affidavit, particularly when the defendant had been put on notice on April 3, 2001, via interrogatories served on the defendant on that date, that the plaintiffs sought information about a nursing supervisor named "Phil"–Wrigley could easily have spoken with any of the defendant's employees named in the document to determine with whom they had spoken about the issues described and thus to determine the identity of the author of the document. An intentional deception or a disturbing lack of competence is the only explanation for the claim, in a sworn affidavit, that the author of the document was unknown.

The court's *in camera* review also revealed the following factual scenario with regard to the Schorfheide deposition: when counsel for the plaintiffs began to probe into what Schorfheide had been told by Cheryl about the alleged drop or fall, the defendant's trial counsel attempted to hide the proof, found in the document, that Schorfheide had been told of the alleged drop or fall, by invoking privilege and instructing Schorfheide not to answer further questions. The defendant's attorneys then sat idly by while, moments later, Schorfheide gave patently false testimony, repeatedly denying any knowledge of the drop or fall, in direct and blatant contradiction to the information found in the document for which the defendant's trial counsel had just invoked privilege. Although the defendant's trial counsel later claimed, at a posttrial hearing held on January 20, 2004, that the documents for which he had invoked privilege during the Schorfheide deposition were other documents authored by Schorfheide–found at pages 45 and 46 of the privilege log filed by the defendant on July 17, 2001–neither of these documents discusses Schorfheide's conversation with Cheryl. In fact, only the document found at pages 21 and 22 of the privilege log discusses Schorfheide's conversation with Cheryl, and only it could have formed the basis for the

defendant's trial counsel's invocation of privilege regarding written notes about that conversation. Accordingly, we find the defendant's trial counsel's self-serving claim that he was invoking privilege for the other documents to be unbelievable and unsupported by the record.

Furthermore, even if we were to assume, *arguendo*, that the document containing written notes about Schorfheide's conversation with Cheryl was privileged, once Schorfheide decided to answer questions about his conversation with Cheryl about the alleged drop or fall, he was obliged to answer them honestly, and the defendant's trial counsel–whose knowledge, we reiterate, of Schorfheide's admission that Cheryl had told Schorfheide of the alleged drop or fall is demonstrated by counsel's invocation of privilege with regard to the document authored by Schorfheide and detailing that admission–was obliged as an officer of the court to ensure he did so. We stress again that the document in question is a mere two pages in length. Given the fact that in the first four sentences of the document Schorfheide admits both that he had a conversation with Cheryl and that Cheryl told him of the alleged drop or fall, it simply defies belief that the defendant's trial counsel could know that the document discussed Schorfheide's conversation with Cheryl–and therefore prompt counsel to invoke privilege when counsel for the plaintiffs attempted to question Schorfheide about that conversation–without also knowing that in the document a mere two sentences later Schorfheide admitted that Cheryl had told him of the alleged drop or fall and that Schorfheide was testifying falsely. Once more, only an intentional deception or a disturbing lack of competence could explain the actions of the defendant's trial counsel in failing to correct the false testimony of Schorfheide or take other appropriate measures.

Accordingly, we do not believe that the trial court erred in concluding that the defendant and its counsel were guilty of intentional deception and intentional discovery violations. That conclusion was reasonable, given the facts available to the trial court

10

following its *in camera* review and to this court on review. As the trial court later stated, in its order regarding the sanctions entered after the trial, "[The] plaintiffs were preparing their case without knowledge of the false early disclosures and unaware of the lies told by Schorfheide in deposition." On notice that it was dealing with a party that had abused the discovery process and otherwise attempted to mislead the court, during the course of the trial the judge then crafted Rule 219(c) sanctions to prevent further intentional deception or other misconduct by the defendant. The Rule 219(c) sanctions with which the defendant takes issue in its brief are the following: (1) an order that the hospital was barred from contending it did not know about Cheryl's complaint that her mother had been dropped and injured; (2) finding, as a matter of law, that the defendant had a duty to include all relevant medical information in Joyce's medical history and that the defendant breached that duty when it failed to include in the medical record the medical history that Joyce alleged she had been dropped and injured; (3) finding, as a matter of law, that the nurses and employees of the defendant involved in Joyce's bed-to-bed transfer were agents of the defendant; (4) barring the defendant from eliciting any testimony the direct or indirect purpose of which was to address any standard of care related to its conduct in investigating Joyce's complaint and its failure to treat the complaint as medical history or as a reporting "occurrence"; (5) barring the defendant's expert witnesses from providing the opinion that Joyce was not dropped unless the expert first assumed that the medical history was tainted by the exclusion of the pertinent medical history of the alleged drop or fall; and (6) barring the defendant's expert witnesses from testifying that the circumstances did not warrant a treatment of the medical history as anything less than a complaint that deserved medical follow-up. We have thoroughly reviewed the nature and scope of the sanctions entered, and we conclude they were a reasonable attempt by the court to prevent further misconduct. The defendant's allegations to the contrary notwithstanding, the sanctions were not punitive in nature, nor

were they excessive; they were tailored to effectuate a fair trial on the merits that conformed to the rules of discovery and trial procedure and to prevent the further abuse of those rules by the defendant.

The defendant next contends that the improper appearance of judicial partiality requires a new trial. Specifically, the defendant contends that the trial judge's responses to objections voiced by counsel for the defendant did not appear impartial and expressed the trial judge's opinion of the defendant's witnesses to the jury, that the trial judge improperly commented on the defendant's witnesses, and that the trial judge failed to adequately address negative media coverage of the trial and the events underlying it. We shall address each of these contentions in turn.

The defendant first alleges that the trial judge's responses to objections voiced by counsel for the defendant did not appear impartial and expressed the trial judge's opinion of the defendant's witnesses to the jury. Specifically, the defendant takes issue with comments by the judge that were made after the defendant repeatedly attempted to take advantage of the fact that Joyce's medical record contained no information about the alleged drop or fall. The judge was forced to remind the jury of the reason the medical record did not contain that information: Schorfheide had failed to chart the alleged drop or fall, despite the fact that he was aware of it. The comments about which the defendant complains are no more than reasonable attempts by the trial judge to control an attorney who was trying desperately to distort the facts of the case to his client's benefit, in contravention of an earlier order by the court that if the defendant were to comment about the medical record, the defendant would have to admit while doing so that the record was tainted by Schorfheide's failure to chart the alleged drop or fall. The judge in this case acted conscientiously and showed fairness, impartiality, and restraint when dealing with a belligerent defendant. There was no error.

The defendant next alleges that the trial judge improperly commented on the

defendant's witnesses. The defendant takes issue with the following statement of the trial judge to counsel for the plaintiffs: "I think one of the parts of your cross[-]examination was to demonstrate that the witness kept notes as opposed to a witness shredding notes." The judge made this statement when overruling an objection by the plaintiffs and finding that the defendant's line of inquiry into the retention of notes was proper. The judge's statement was a reasonable explanation to counsel for the plaintiffs for why he was overruling her. The defendant's suggestion that the statement was the trial court's veiled attempt to convey to the jury that "he believed [the defendant's] witnesses were in the practice of shredding their notes" is absurd and unworthy of further comment. There was no error.

The defendant also alleges that the trial judge failed to adequately address negative media coverage of the trial and the events underlying it. Specifically, the defendant alleges the trial court erred when it denied the defendant's motion for a mistrial after an article discussing the case appeared in the St. Louis Post-Dispatch in the middle of the trial. The article quoted a statement, purportedly made in court but outside the presence of the jury, from the trial judge to the effect that the defendant "swept" Joyce's medical history "under the carpet and hid it." The defendant contends the trial court "failed to offer [the defendant] the same chance to poll the jury that it had previously offered" to the plaintiffs after a letter the defendant's chief executive officer, Harry Maier, had written to employees of the defendant appeared in the Belleville News-Democrat–a letter in which Maier had proclaimed–falsely, it turns out, in light of Schorfheide's admission that he had lied in his deposition–that no attempt to deny the existence of the alleged drop or fall had been made by employees of the defendant.

It is true that following the appearance of Maier's letter in the Belleville News-Democrat, the trial judge asked counsel for the plaintiffs if she wished to poll the jury, and even though counsel for the plaintiffs declined to poll the jury, the offer itself should have

13

put the defendant on notice that the trial judge was more than willing to poll the jury if circumstances so required. It is equally true that the defendant never asked to have the jury polled following the publication of the St. Louis Post-Dispatch article. Indeed, the defendant was reminded that for a mistrial to be granted, the article "would have to be something that the jury knew about." Nevertheless, the defendant did not ask to poll the jury. The defendant does not provide any legal authority for the proposition that the court must *sua sponte* afford to a party the opportunity to poll the jury, even in the absence of a request from that party to poll the jury, and we are aware of no authority to that effect. Indeed, in the principal case relied upon by the defendant, *People v. Weaver*, 90 Ill. App. 3d 299, 306 (1980), *aff'd on other grounds*, 92 Ill. 2d 545 (1982), one of the parties made a specific request that the jury be polled. In this case, the defendant had the opportunity to determine if any prejudice had resulted from the St. Louis Post-Dispatch article. However, the defendant failed to avail itself of that opportunity. Furthermore, although the defendant claims that the trial judge denied the defendant's "motion for a new trial without reading the motion or the attached offending newspaper article," the record citation following this rather bold claim is to pages R1048 and R1049 of the report of proceedings–pages that are not included in the record on appeal created by the defendant and filed with this court for this appeal and that, according to the index of the record prepared by the defendant, do not exist. In light of the defendant's failure, at the trial, to ask to have the jury polled and the defendant's citation, on appeal, to nonexistent pages of the record, we decline to find error in the trial court's denial of the defendant's motion for a mistrial.

The defendant next contends that errant evidentiary rulings require a new trial. The defendant takes issue with five rulings or sets of rulings by the court, each of which shall be addressed in turn. We begin, however, by reciting the relevant standard of review: we will not reverse on the basis of an erroneous evidentiary ruling unless the error was prejudicial

14

or the result of the trial has been materially affected. *Stricklin v. Chapman*, 197 Ill. App. 3d 385, 388 (1990). The first evidentiary error asserted by the defendant is that the admission into evidence of Joyce's unredacted death certificate violates both the Code of Civil Procedure (735 ILCS 5/8-2001 (West 2002)) and the Vital Records Act (410 ILCS 535/25 (West 2002)). In its opening brief, the defendant contends the admission into evidence of the death certificate prejudiced the defendant because "it addressed issues central to case [*sic*][] and lent the improper appearance of government approval to [the plaintiffs'] view of these issues." Specifically, the defendant objects to the evidence because the certificate listed Joyce's closed head injury as the cause of her death and because it stated the injury occurred "by history dropped" and listed the date of injury as the date of the alleged drop or fall. The defendant contends that hearsay found within the certificate–"by history dropped" and the listing of the date of injury as the date of the alleged drop or fall–was relevant only to prove the truth of the matter asserted: that a drop occurred and that it was the cause of Joyce's death.

As noted above, we will not reverse on the basis of an erroneous evidentiary ruling unless the error was prejudicial or the result of the trial has been materially affected. *Stricklin v. Chapman*, 197 Ill. App. 3d 385, 388 (1990). In this case, we conclude that even if we assume, without deciding, that the admission of the death certificate into evidence was erroneous, the defendant has not demonstrated prejudice sufficient to warrant a reversal. With regard to the defendant's assertion that the certificate should not have been admitted into evidence because it listed Joyce's closed head injury as the cause of her death and was improperly used to attempt to prove that proposition, we note that the jury found for the defendant on the plaintiffs' wrongful death action, a finding that negates any possible prejudice to the defendant regarding Joyce's cause of death. As explained above, the claim upon which the plaintiffs prevailed–and the claim upon which this appeal is based–is the

15

plaintiffs' survival action. The elements that must be proven to recover for pain and suffering in a survival action–and that were proven in this case–are discussed at length elsewhere in this opinion. The actual cause of the death of a victim has no bearing on an otherwise proper survival action, and so the defendant could suffer no prejudice in the survival action from a document listing Joyce's cause of death.

With regard to the defendant's assertion that the certificate should not have been admitted because hearsay found within the certificate–"by history dropped" and the listing of the date of injury as the date of the alleged drop or fall–was relevant only to prove the truth of the matter asserted (here, that a drop or fall actually occurred), we note that the certificate does not state that a drop or fall occurred. Rather, the certificate states only that a history of a drop or fall had been conveyed to the coroner, a fact of which the jury was already aware. Likewise, the date of the alleged drop or fall had also already been conveyed to the jury, and we do not believe that the jury would view the certificate as anything other than what it was–a reflection, but not a confirmation, of allegations of which it was already aware. Just as the jury was free to conclude, on the basis of all the other evidence presented, that no drop or fall ever happened, so, too, was the jury free to come to that conclusion on the basis of the contents of the death certificate, which stated nothing to the contrary. Accordingly, we see no prejudice to the defendant in the admission of the certificate into evidence.

The second evidentiary error asserted by the defendant is that a privileged document should not have been admitted into evidence. The document about which the defendant complains is, according to the defendant's opening brief, the same document discussed in detail above and found at pages 21 and 22 of the privilege log. As discussed above, this document, authored by Phil Schorfheide, demonstrates that Schorfheide had been told by Cheryl about Joyce's alleged drop or fall. The defendant claims that the document was

16

created as a part of a quality management council subcommittee review and, thus, is afforded the protections of the medical studies statute (735 ILCS 5/8-2101 *et seq.* (West 2000)). The burden of establishing a discovery privilege under the medical studies statute is on the party seeking to invoke it. *Ardisana v. Northwest Community Hospital, Inc.*, 342 Ill. App. 3d 741, 746 (2003). No privilege exists with regard to information or documents that might have been relied upon in the peer-review process but were generated prior to the process. *Chicago Trust Co. v. Cook County Hospital*, 298 Ill. App. 3d 396, 403 (1998).

Here, the defendant has failed to meet its burden to prove that the document was created after the convening of the review process. The only evidence put forth by the defendant in its opening brief in support of its contention that the document was created after the convening of the review process is the affidavit of Wrigley, also discussed in detail above, which recites in rote fashion–as it does for virtually all the documents in the privilege log–that the document in question was "prepared specifically for use by and at the direction of" the review committee. However, we have already determined that Wrigley's affidavit–which also claimed that the author of the document in question was unknown–is unbelievable on its face. We decline to give weight to this inherently unbelievable affidavit, and we conclude that it offers no proof of when the document in question was created. Furthermore, as the plaintiffs point out, even if we were to give weight to Wrigley's affidavit, blanket conclusions such as those found in Wrigley's affidavit that information was generated at the request of a reviewing committee are not enough to invoke the protections of the medical studies statute. See *Chicago Trust Co.*, 298 Ill. App. 3d at 404. An affidavit is ineffective when the statement contained therein is "pure conclusion, bereft of facts" (*Chicago Trust Co.*, 298 Ill. App. 3d at 404). Finally, we note that Schorfheide, who actually authored the document in question, testified that he did not know when it had been created or to whom he conveyed it after authoring it. The defendant did not adequately prove that

17

the document was created after the convening of the review process, and the trial court did not err when it ruled the document in question was not protected by the medical studies statute.

The third evidentiary error asserted by the defendant is that undisclosed expert testimony on the standard of care in this case, and other undisclosed "expert" testimony, should not have been admitted into evidence. Specifically, the defendant takes issue with testimony given by nurses Nancy Weston, Kathy Schmidt, Karen Krooswyk, and Joyce Tomlinson. We begin by noting that Weston, the defendant's vice president of nursing, did not offer testimony on the standard of care relevant to any issue in controversy in this case. The defendant complains that during the cross-examination of Weston as an adverse witness, "Weston was allowed to testify to general hospital standards of care for patient care and the standard of care for bed-to-bed patient transfers" and "was later permitted to answer a question regarding what the standard of care would have been in 1999 for transferring a non[]ambulatory patient while reducing the risk of injury." The defendant neglects to inform the court, however, that although Weston did testify she believed that patients in 1999 were entitled to "high-quality, cost-effective services," she specifically testified that she did not consider her testimony to set or describe a standard of care, which, she testified, she believed was "an action or an intervention evidence-based." Nor does the defendant inform the court that although Weston was asked several times about standards of care in general, at no time did Weston testify about "the standard of care for bed-to-bed patient transfers," nor did she testify regarding what the standard of care was in 1999 for transferring a nonambulatory patient while reducing the risk of injury. To the contrary, when asked about the latter, she testified that because she was not employed by the defendant in 1999, she could not testify about "what was in place" then. Accordingly, we find no error–and thus no potential prejudice to the defendant–in the admission of Weston's rather general, innocuous, and

18

irrelevant testimony into evidence.

The defendant also objects to certain testimony of nurse Kathy Schmidt. Specifically, the defendant contends that when counsel for the plaintiffs elicited an agreement from Schmidt that in February 1999 "the nurses [employed by the defendant] were obligated to follow [the Nursing and Advanced Practice Nursing Act (Act) (225 ILCS 65/5-1 *et seq.* (West 2002))] in rendering good, adequate medical care" to Joyce, counsel was improperly questioning Schmidt "regarding the standard of care in nursing." The defendant makes no coherent argument for how the defendant might have been prejudiced by Schmidt's agreement that the nurses were obligated to follow the Act, nor does the defendant explain how Schmidt's agreement improperly established a standard of care. The defendant cites no testimony linking the Act to any action or inaction on the part of any hospital employee in this case or to any testimony linking the Act to any standard of care in this case. The defendant's argument is not persuasive.

The defendant next objects to certain testimony of nurse Karen Krooswyk, the plaintiffs' expert witness in this case. Specifically, the defendant contends that even though the plaintiffs' disclosure specifically stated that Krooswyk would testify with regard to "the nursing standard of care in allowing a patient to fall or be dropped in a transfer, in failing to protect a patient during a transfer, and in failing to report a fall or drop if there was reason to believe it had occurred," it did not state that Krooswyk would testify about the standard of care "in bed positioning during a bed-to-bed transfer." Accordingly, the defendant contends, Krooswyk should not have been allowed to testify about the latter. However, the defendant fails to explain how Krooswyk could have testified, in the context of this case, to that which had been disclosed without also testifying about bed positioning during a bed-to-bed transfer. The defendant's claim of unfair surprise regarding Krooswyk's testimony is unpersuasive. The disclosure rendered by the plaintiffs was adequate to apprise the

19

defendant that Krooswyk might testify about bed positioning during a bed-to-bed transfer.

The defendant also takes issue with certain testimony of nurse Joyce Tomlinson. Tomlinson was one of the nurses who participated in the transfer of Joyce Cretton, and although Tomlinson denied that Joyce had fallen or been dropped during the transfer, she testified that the transfer was "a little rougher" than she would have liked. The defendant contends that Tomlinson's testimony about closed head injuries and their symptoms should not have been allowed because Tomlinson had not been disclosed as an expert on those subjects. We do not agree. First, we note that none of the testimony of Tomlinson to which the defendant objects related to the facts at issue in this case. In the testimony complained of, Tomlinson did not testify about the causation of the head injury at issue in this case, nor did she testify about the presence or absence of any symptoms of a closed head injury in Joyce or about any pain and suffering Joyce might have experienced as a result of that head injury. In fact, Tomlinson denied that Joyce suffered any injury at all. Based upon her admission that she had cared for "many" patients with subdural hematoma, Tomlinson merely answered general questions about the various ways head injuries present themselves, before returning to her denial that Joyce had fallen or been dropped during the transfer. She then continued to testify about the events surrounding the transfer, but she did so not as an expert but on the basis of her direct observation of those events. We note as well that the only objection made contemporaneously with Tomlinson's testimony was that the questions asked of Tomlinson called "for medical opinions." There was no objection that Tomlinson was providing undisclosed expert testimony about an issue in the case. We are unable to see how any prejudice to the defendant resulted from Tomlinson's testimony, and we conclude there is no merit to the defendant's contention that we should reverse the trial court on the basis of her testimony.

The fourth evidentiary error asserted by the defendant is that undisclosed expert

testimony via hearsay statements read to the jury from a neurology textbook during the cross-examination of the defendant's expert witness should not have been admitted into evidence. The defendant contends the admission of this evidence prejudiced the defendant because "it surreptitiously allowed [counsel for the plaintiffs] to introduce such evidence as being pertinent to the standard of care." We agree with the defendant that the trial court erred in allowing counsel for the plaintiffs to read from the textbook without first laying a proper foundation (which, we note, would have been very easy for her to do). However, as noted above, we will not reverse on the basis of an erroneous evidentiary ruling unless the error was prejudicial or the result of the trial was materially affected. *Stricklin v. Chapman*, 197 Ill. App. 3d 385, 388 (1990). Here, a close review of the report of proceedings reveals that the entire cross-examination in question was an attempt by counsel for the plaintiffs to discredit the defendant's expert witness's theory that it was COPD, rather than a head injury, that caused Joyce's death. Because the cross-examination focused only on the cause of death, on the possibility that Joyce's death was caused by a head injury rather than COPD, it was relevant only to the plaintiffs' wrongful death action, upon which the defendant prevailed. The cross-examination of this witness did not involve the plaintiffs' survival action in any way, shape, or form: there was no testimony at all during the cross-examination about pain and suffering or the other elements of the claim upon which the plaintiffs prevailed and from which the defendant now appeals or about whether the alleged drop or fall and the allegedly resulting head injury actually took place. Accordingly, we find no prejudice to the defendant in the erroneous admission of this evidence.

The fifth and final evidentiary error asserted by the defendant is that the trial court erred when it allowed the plaintiffs, following the close of the evidence, to amend their complaint. Specifically, the defendant contends the trial court permitted the plaintiffs "to file an amended complaint that set forth completely new theories of duty, breach, and causation

21

at the close of evidence," because the amended complaint added the allegation that the defendant was negligent when it allowed Joyce "to fall, be significantly jarred, or otherwise become injured."  Although the amendment was made in response to testimony from the defendant's own expert witness, Dr. Mary Case, that Joyce's subdural hematoma could have been caused by a "jarring," the defendant nevertheless claims that the amendment operated to "surprise" the defendant and denied the defendant the opportunity to defend against the newly alleged theory of recovery.

A pleading may be amended at any time, before or after the judgment, to conform the pleadings to the proofs.  735 ILCS 5/2-616(c) (West 2004).  "This section is to be liberally construed so that cases are decided on their merits and not on procedural technicalities. [Citation.]  Whether amendment of pleadings is to be allowed is a matter within the sound discretion of the court, and absent an abuse of this discretion, a court's determination will not be overturned on review. [Citation.] Doubts about allowing amendments should be resolved in favor of amendment; however, where the amendment is made to conform the pleadings to the proof, the amendment will not be allowed unless the evidence already produced supports the amendment. [Citation.]" *Pry v. Alton & Southern Ry. Co.*, 233 Ill. App. 3d 197, 213 (1992).

In this case, the defendant's claim of surprise is unpersuasive.  First, the defendant was well aware of Dr. Case and her theory that Joyce's subdural hematoma could have been caused by a "jarring."  Indeed, Dr. Case was the defendant's own expert witness, the "jarring" theory was the defendant's theory, and the defendant had disclosed Dr. Case and her "jarring" theory to the plaintiffs a full nine months before the trial began.  Second, the amendment in question did not "set forth completely new theories of duty, breach, and causation."  The theory that the defendant was negligent when it allowed Joyce "to fall, be significantly jarred, or otherwise become injured" is completely consistent with the theory advanced in the

22

original complaint filed by the plaintiffs, which set forth a number of allegedly negligent and careless acts on the part of the defendant, including, *inter alia*, that the defendant negligently and carelessly attempted to transfer Joyce by forcing her to attempt to stand when she could not, that the defendant negligently and carelessly failed to have adequate assistance during the bed-to-bed transfer, that the defendant negligently and carelessly allowed Joyce "to fall" during the transfer, and that the defendant negligently and carelessly failed to inform anyone that Joyce had fallen during the transfer. The original complaint then alleged that as a direct and proximate result of "one or more of the foregoing negligent acts or omissions" by the defendant, Joyce was injured. We conclude that the fact that some kind of "jarring" might have occurred during one or more of the aforementioned acts of negligence and/or carelessness is implicit in the allegations of the original complaint. There is no merit to the defendant's contention that the amendment operated to "surprise" the defendant.

The defendant also contends that because of the sanctions discussed earlier in this opinion, the defendant "was expressly barred by [the trial court] from presenting evidence" to defend against the theory of "jarring." This contention is unpersuasive; in fact, it simply is untrue. Following the disclosure of Schorfheide's lies and the defendant's misconduct with regard to those lies, the defendant was prevented, *inter alia*, from contesting (1) that a fall was alleged, (2) that the alleged fall had been reported to Schorfheide, and (3) that the allegations made to Schorfheide were not properly reported and documented in Joyce's medical record. Furthermore, the defendant's expert witnesses were prevented from providing the opinion that Joyce was not dropped unless the expert first assumed that the medical history was tainted by the exclusion of the pertinent medical history of the alleged drop or fall. However, no sanction imposed by the trial court ever "expressly barred" the defendant from defending itself from the underlying accusation that Joyce actually fell, was dropped, and/or was jarred. In fact, the question of whether anything happened in the

23

hospital to cause Joyce's head injury was always open for challenge–it was one of the key issues before the jury, and the defendant was always free to advance its position on this issue. That the defendant was unsuccessful in doing so does not equate with being prevented from attempting to do so. There is no merit to the defendant's contention that sanctions prevented it from defending against a theory of "jarring."

The defendant also contends that even though the defendant's expert witness Dr. Case and her theory of "jarring" had been disclosed by the defendant nine months prior to the trial, the plaintiffs nevertheless were required to disclose Dr. Case as an expert witness in support of their position. The defendant cites no authority in support of its contention that a witness disclosed as an expert by one party must also be disclosed by the opposing party, lest the originally disclosing party be surprised and prejudiced by the witness testifying in a manner consistent with the original disclosure, and finding the defendant's contention unconvincing, we decline to consider it further.

The amendment in this case was made to conform the pleadings to the proof, and the evidence produced prior to the introduction of the amendment supported the amendment. Accordingly, under long-standing, existing Illinois precedent–and under the plain language of the Code of Civil Procedure (735 ILCS 5/2-616(c) (West 2004))–the amendment in this case was permissible.

The defendant next contends that prejudicial and inappropriate comments by counsel for the plaintiffs during the trial and in the closing argument require a new trial. However, the defendant has presented absolutely no evidence or argument regarding any allegedly "prejudicial and inappropriate" comments during the trial and has therefore waived this issue on appeal. See Official Reports Advance Sheet No. 12 (June 7, 2006), R. 341(h)(7), eff. Sept. 1, 2006 (points not argued in an opening brief are waived and shall not be raised in the reply brief, in oral argument, or in a petition for rehearing). With regard to allegedly

24

"prejudicial and inappropriate" comments in the closing argument, the defendant contends that counsel for the plaintiffs "repeatedly made improper and highly inflammatory comments regarding [the defendant's] case, counsel[,] and witnesses during closing argument." However, in the record on appeal that the defendant prepared and forwarded to this court for this appeal, the defendant has failed to include any of the pages of the report of proceedings cited by the defendant in support of this argument–pages R667, R668, R671, and R682. It is the appellant's responsibility to provide an adequate record on appeal, and in the absence of a complete record, this court is compelled to assume that the missing evidence supports the lower court's decision. *People v. Haycraft*, 349 Ill. App. 3d 416, 429 (2004).

Nevertheless, because the plaintiffs do not raise the issue of the missing pages and do not contest the accuracy of the remarks to which the defendant takes exception, we shall consider the defendant's contention that counsel for the plaintiffs "repeatedly made improper and highly inflammatory comments regarding [the defendant's] case, counsel[,] and witnesses during closing argument." Specifically, the defendant objects to counsel's purported statement that she tends to get upset "when [she] believe[s] people are only telling half truths" and when she allegedly reminded the jury that it had been proven that Schorfheide had lied, in the presence of attorneys for the defendant, at his deposition and had thereby deprived the plaintiffs, until just before the start of the trial, of critical information about Joyce's alleged drop or fall. The defendant claims that counsel's comments were inappropriate because there was no evidence that the defendant's attorneys "encouraged any lies or misstatements by Schorfheide" or that the defendant's attorneys "intentionally withheld non[]privileged information from" the plaintiffs. We have addressed in detail above the misconduct of the defendant in relation to Schorfheide's notes and his deposition testimony. Suffice it to say that we conclude that the comments of counsel for the plaintiffs about this issue were a fair and accurate representation of what happened and were not "improper and

25

highly inflammatory." Because these comments were supported by the record, we decline to conclude they were inappropriate. See *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 128 (1997) (where the record supports a claim that opposing counsel or parties falsified evidence, counsel may fairly comment upon that evidence).

The defendant also takes issue with comments, allegedly made in closing argument by counsel for the plaintiffs, that the defendant was "the Enron of Belleville" and with the purported comment of the judge, when he overruled the defendant's objection to counsel's comments, that "[t]he jury has heard evidence related to the problems with the medical history and the fact that these matters were not discovered until just Monday of last week or so." The defendant contends the judge's comment "endorsed to the jury [the plaintiffs'] cover-up theory." Counsel is afforded wide latitude in closing argument. *Ellington v. Bilsel*, 255 Ill App. 3d 233, 238 (1993). Although we do not approve of comments such as the alleged labeling of the defendant as "the Enron of Belleville," given the significant evidence of misconduct by the defendant in this case, discussed in detail above, we cannot conclude that any of the comments objected to by the defendant on appeal are so beyond the realm of fair commentary supported by the evidence to be unduly prejudicial. Nor do we agree that the judge's purported comment–which, if made, accurately reflected the evidence presented to the jury–served to endorse the plaintiffs' cover-up theory. Accordingly, we find no merit to the defendant's unsupported contention that comments made by counsel for the plaintiffs in closing argument require a new trial.

The defendant next contends that cumulative error mandates a new trial. Specifically, the defendant posits, "Although each of the errors previously described individually warrants the granting of a new trial, their cumulative effect denied [the defendant] a fair trial." However, as explained in great detail above, we have found no prejudicial errors on the part of the trial court. Accordingly, in the absence of even one prejudicial error, we decline to

conclude that cumulative error mandates a new trial.

The defendant next contends that the sanctions under Supreme Court Rule 137 (155 Ill. 2d R. 137), entered after the trial, were in error. The defendant alleges two errors in the entry of the sanctions: first, that the defendant did not file any pleading sanctionable under Rule 137 and, second, that the posttrial sanctions were duplicative of the Rule 219(c) sanctions discussed above and thus are not permissible. We begin our analysis by providing some background information about Rule 137 sanctions. "Rule 137 states that both the parties and the attorneys have an affirmative duty to conduct an inquiry of the facts and the law before filing an action, pleading, or other paper and that the failure to make such an inquiry could subject them to sanctions." *Rankin v. Heidlebaugh*, 321 Ill. App. 3d 255, 259-60 (2001); 155 Ill. 2d R. 137. The rule requires, *inter alia*, that a party or litigant make a reasonable inquiry into the basis for any pleading or other paper and not to interpose the pleading or other paper for any improper purpose. 155 Ill. 2d R. 137; *Rankin*, 321 Ill. App. 3d at 260. "The purpose of Rule 137 is to prevent the abuse of the judicial process by penalizing those who bring vexatious or harassing actions without sufficient foundation. [Citation.] This rule is penal in nature and must be strictly construed. [Citation.]" *Rankin*, 321 Ill. App. 3d at 260.

"The burden on a party seeking [Rule 137] sanctions is to show that the opposing party made untrue and false allegations without reasonable cause. [Citation.] The trial court must employ an objective standard to determine whether a party made a reasonable inquiry; subjective good faith is insufficient to meet the burden of Rule 137. [Citations.]

When reviewing a trial court's decision to impose sanctions, the appellate court must determine whether the circuit court's decision was informed, based on valid reasons, and followed logically from the circumstances of the case. [Citation.]"

*Burrows v. Pick*, 306 Ill. App. 3d 1048, 1050-51 (1999).

"To determine whether a particular inquiry by an attorney or party who has signed a pleading was reasonable, we must look to the facts and circumstances that existed at the time the pleading was filed." *Burrows*, 306 Ill. App. 3d at 1054. "The law is well settled that the appellate court should give considerable deference to the court's decision to impose sanctions[,] and that decision will not be reversed absent an abuse of discretion." *Burrows*, 306 Ill. App. 3d at 1051. A trial court abuses its discretion with regard to Rule 137 sanctions when no reasonable person could take the view that the court adopted. *Whitmer v. Munson*, 335 Ill. App. 3d 501, 514 (2002).

The defendant contends the trial court in this case granted Rule 137 sanctions on the basis of two pleadings: the defendant's response to the plaintiffs' interrogatories dated July 19, 2001, and the defendant's privilege log, dated July 17, 2001. With regard to the interrogatories, the specific interrogatory in question, number 25, asked the defendant to identify "the nursing supervisor at defendant hospital known as Phil (last name unknown) who discussed [with Cheryl Cretton] the problems encountered during the transfer [of Joyce Cretton]." The defendant answered that it "denie[d] that the substance of the conversation was as described in this interrogatory" and then identified Phil Schorfheide as the only nursing supervisor named Phil. The trial court found in its order entering sanctions that the defendant's answer was the equivalent of denying "that Schorfheide even had a conversation with [Cheryl] about her mother's problem on transfer," a position that contradicted the information found in the defendant's privilege log in the document found at pages 21 and 22. The trial court concluded that "[n]othing short of conscious disregard and utter indifference for the truth" could explain "how the hospital could make the connection between Cheryl Cretton and Phil Schorfheide but fail to associate him with [the document found at pages 21 and 22 of the privilege log]."

28

The defendant contends its response to interrogatory 25 was not false and was not sanctionable, because the defendant "truthfully and completely" identified Schorfheide and because the answer did not contradict the privilege log but "merely disputed the vague characterization of the 'discussion' referenced in the interrogatory." However, we believe that the position taken by the trial court–that the answer was an attempt to deny the existence of a conversation between Schorfheide and Cheryl in which Cheryl reported the alleged drop or fall–is reasonable and equally plausible and that the trial court did not abuse its discretion in so concluding. The trial court's decision was informed, based on valid reasons, and followed logically from the circumstances of the case. Likewise, the court's decision was legitimately premised on an examination of the facts and circumstances that existed at the time the pleading was filed, not on hindsight. By the time the defendant filed its answer to interrogatory 25, the defendant had already filed a privilege log that verified a conversation between Schorfheide and Cheryl in which Cheryl reported the alleged drop or fall. Accordingly, any subsequent attempt to deny that such a conversation occurred could legitimately be seen as both false and without reasonable cause. We cannot conclude that no reasonable person would take the view adopted by the trial court. Accordingly, we conclude that the trial court did not abuse its discretion when it determined that the defendant and its agents were subject to Rule 137 sanctions for its false pleading.

With regard to the sanctions entered because of the claim in the privilege log that the author of the document at pages 21 and 22 was unknown, we have already explained, in detail above, that the identity of the author of the document could have been easily ascertained, for even if one somehow overlooked the name "Phil" at the bottom of the document, anyone genuinely interested in determining the identity of the author could easily have spoken with any of the defendant's employees named in the document to determine with whom they had spoken about the issues described and thus in that way determine who

authored the document. The defendant notes that the attorney who signed the privilege log testified at a February 11, 2004, hearing that at the time she signed the privilege log, she did not know who had authored the document. However, none of the excuses offered by the attorney negates the fact, explained above, that a reasonable inquiry concerning the content of the document itself easily would have led to the identity of the author. The facts and circumstances that existed at the time the pleading was filed on July 17, 2001, demonstrate that a reasonable inquiry had not been made prior to the filing of the false statement, in the privilege log, that the author of the document at pages 21 and 22 was unknown. Accordingly, we do not believe that the trial court abused its discretion in concluding that the defendant and its agents were subject to Rule 137 sanctions for its false pleading. The trial court's decision was informed, based on valid reasons, and followed logically from the circumstances of the case.

The defendant also contends the posttrial sanctions were duplicative of the Rule 219(c) sanctions discussed above and thus are not permissible. We do not agree. The Rule 219(c) sanctions, as explained above, were not punitive in nature–they were entered during the course of the trial and were tailored to effectuate a fair trial on the merits that conformed to the rules of discovery and trial procedure and to prevent the further abuse of those rules by the defendant. The Rule 137 sanctions, on the other hand, were punitive, and they were entered after the conclusion of the trial to punish the defendant and its attorneys for their misconduct. Furthermore, the Rule 219(c) sanctions were in the nature of evidentiary rulings limiting the conduct of the defendant at the trial, whereas the Rule 137 sanctions were in the nature of monetary penalties imposed upon the defendant. Nevertheless, the defendant contends that "there were simply no Rule 137 motions or sanctions pending before the trial court at the completion of the trial" because all the issues of misconduct and deceit had been addressed by the Rule 219(c) sanctions. In support of this proposition, the defendant cites

30

the trial judge's statement on August 11, 2003: "I have all but completed an order that summarizes everything that I think is pertinent to any ruling related to sanctions in this case." There are two problems with the defendant's position. First, the statement quoted above is taken entirely out of context. It was made by the judge while ruling on the defendant's motion for a mistrial, discussed above, not at the conclusion of the trial. Second, the trial judge subsequently stated, both orally and in a written order, that his comments addressed only the Rule 219(c) sanctions and that it had always been his intention not to stop the trial to hold a minitrial, within the trial, on the issue of the Rule 137 sanctions. The record does not contradict the position taken by the trial judge, and we decline to disturb his finding that the portion of the plaintiffs' motion for sanctions that related to Rule 137 remained viable after the trial. Accordingly, we conclude that the posttrial sanctions were not duplicative of the Rule 219(c) sanctions discussed above and are permissible.

The defendant also contends that "the trial court erred in permitting plaintiffs' counsel to conduct discovery solely to support an [Attorney Legislative and Disciplinary Commission (ARDC)] charge" against trial counsel for the defendant. According to the defendant, counsel for the plaintiffs "herself admitted that the real purpose of the post[]trial deposition of Schorfheide was to seek information in support of an ARDC complaint." We do not agree with the defendant's accusation that an improper purpose motivated the plaintiffs' desire to take a posttrial deposition of Schorfheide. To the contrary, an objective reading of the record reveals that the deposition was a necessary component of the plaintiffs' development of a record supporting the Rule 137 sanctions. Again, there was no error.

The final argument raised on appeal by the defendant is that the amount of the aforementioned posttrial sanctions was erroneous. Specifically, the defendant contends that the $125,000 in attorney fees and $4,089.90 in costs awarded as sanctions are "excessive and without support in the record." We do not agree. In general, a petition for attorney fees must

31

present the court with detailed records containing facts and computations upon which the charges are predicated and specifying the services provided, by whom they were performed, the time expended, and the hourly rate charged. *Chicago Title & Trust Co. v. Chicago Title & Trust Co.*, 248 Ill. App. 3d 1065, 1072 (1993). In assessing the reasonableness of fees, the trial court should consider a variety of factors, including the skill and standing of the attorneys employed, the nature of the case, the novelty and difficulty of the issues involved, the degree of responsibility required, the usual and customary charge for the same or similar services in the community, and whether there is a reasonable connection between the fees charged and the litigation. *Chicago Title & Trust Co.*, 248 Ill. App. 3d at 1072. The trial court is permitted to use its own knowledge and experience to assess the time required to complete particular activities, and a court of review may not reverse an award of attorney fees merely because it might have reached a different conclusion. *Olsen v. Staniak*, 260 Ill. App. 3d 856, 866 (1994). With regard to Rule 137 sanctions, the law is well-settled that this court should give considerable deference to the trial court's decision to impose sanctions, and that decision will not be reversed absent an abuse of discretion. *Burrows v. Pick*, 306 Ill. App. 3d 1048, 1051 (1999). A trial court abuses its discretion with regard to Rule 137 sanctions when no reasonable person could take the view the court adopted. *Whitmer v. Munson*, 335 Ill. App. 3d 501, 514 (2002). We have thoroughly reviewed the arguments of both parties, as well as the sanctions orders of the trial court and the methodology used to compute the amount of the sanctions requested, and we cannot conclude that no reasonable person could take the view the court adopted.

First, we note that because counsel for the plaintiffs operated under a contingency fee agreement with the plaintiffs and therefore did not keep detailed records of the time spent in the preparation for and the execution of the case, the plaintiffs' original request for sanctions was in the amount of $316,350 for attorney fees (roughly one-third of the amount of the

32

jury's verdict) and $24,542.57 in expenses. The trial court rejected this request and asked the plaintiffs to return with a detailed estimate of the actual hours worked on this case with regard only to the recognized misconduct of the defendant. The plaintiffs then filed an amended petition for attorney fees and expenses in which the plaintiffs requested $136,080 in attorney fees and $4,089.90 in expenses, advising that these requests represented "expenses and estimations" made in "a good faith effort to supplement the record." The judge determined that the defendant's false pleadings without reasonable cause in this case became "the cornerstone of the entire baseless defense." The judge noted, as was permissible, his own expertise in evaluating attorney fees in litigation of this kind, as well as the skill and standing of the attorneys employed, the nature of the case, and the novelty and difficulty of the issues involved, particularly where, as here, one is faced with a defendant that "cheats and hides evidence." On the basis of these factors, the court awarded $125,000 in attorney fees and $4,089.90 in costs. The trial court was in a better position than is this court to determine the reasonableness of the fees specified in the plaintiffs' petition, having observed the defendant's misconduct and the ramifications deriving therefrom throughout the proceedings. We simply cannot conclude that no reasonable person could take the view the court adopted, and we decline to make a *de novo* decision regarding the appropriate award of attorney fees (see *Chicago Title & Trust Co. v. Chicago Title & Trust Co.*, 248 Ill. App. 3d 1065, 1075 (1993)).

For the foregoing reasons, we affirm the August 14, 2003, order entering a judgment in the amount of $950,000 on a jury verdict rendered the previous day for the plaintiffs on their survival action against the defendant; the March 7, 2005, order awarding sanctions in the amount of $129,089.90 against the defendant; and the July 18, 2005, order denying the defendant's motion for a judgment *n.o.v.*, a new trial, remittitur, and/or the vacation of the March 7, 2005, sanctions.

33

Affirmed.

WELCH, P.J., and DONOVAN, J., concur.

NO. 5-05-0474

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | |
|---|---|
| CECIL V. CRETTON and CHERYL L. CRETTON, Coadministrators of the Estate of Joyce E. Cretton, Deceased, | ) Appeal from the<br>) Circuit Court of<br>) St. Clair County.<br>) |
| Plaintiffs-Appellees, | ) |
| | ) |
| v. | ) No. 00-L-64 |
| | ) |
| PROTESTANT MEMORIAL MEDICAL CENTER, INC., d/b/a Memorial Hospital of Belleville, | )<br>) Honorable<br>) Robert P. LeChien, |
| Defendant-Appellant. | ) Judge, presiding. |

**Opinion Filed**: February 28, 2007

**Justices**: Honorable Stephen L. Spomer, J.

Honorable Thomas M. Welch, P.J., and
Honorable James K. Donovan, J.,
Concur

**Attorneys for Appellant**: Michael A. Pollard, Lindsay A. Philiben, Garrett Phipps, Damon Stevens, Baker & McKenzie, LLP, One Prudential Plaza, 130 East Randolph Drive, Chicago, IL 60601; Edward S. Bott, Robert L. Duckels, Greensfelder, Hemker & Gale, P.C., 2000 Equitable Building, 10 South Broadway, St. Louis, MO 63102-1774

**Attorney for Appellees**: Judy L. Cates, Candice C. Kusmer, The Cates Law Firm, L.L.C., 216 West Pointe Drive, Suite A, Swansea, IL 62226