Nos. 2--06--0724 & 2--06--0731 cons.     Filed:  8-8-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JOHN KIRKPATRICK, WILLIAM SMITH, MARY ELIZABETH SENTOWSKI, and GREGORY CALDWELL, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 00--L--473 |
| | ) | |
| DAVID STROSBERG, MORNINGSIDE DEVELOPMENT GROUP, INC., and GLEN ASTOR CONDOMINIUM INVESTORS L.P., | ) ) ) ) | Honorable Stephen J. Culliton, |
| Defendants-Appellees. | ) ) | Judge, Presiding. |

| | | |
|---|---|---|
| JOHN KIRKPATRICK, WILLIAM SMITH, MARY ELIZABETH SENTOWSKI, and GREGORY CALDWELL, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | No. 00--L--473 |
| | ) | |
| DAVID STROSBERG, MORNINGSIDE DEVELOPMENT GROUP, INC., and GLEN ASTOR CONDOMINIUM INVESTORS L.P., | ) ) ) ) | Honorable Stephen J. Culliton, |
| Defendants-Appellants. | ) ) | Judge, Presiding. |

JUSTICE McLAREN delivered the opinion of the court:

Plaintiffs, John Kirkpatrick, William Smith, Mary Elizabeth Sentowski, and Gregory Caldwell, buyers of luxury condominiums in Glen Ellyn, Illinois, appeal the trial court's judgment in favor of defendants, David Strosberg, Morningside Development Group, Inc., and Glen Astor Condominium Investors L.P., builders of the condominiums, on certain breach-of-contract and consumer-fraud claims. Plaintiffs also appeal the trial court's award of nominal damages to them on the consumer-fraud counts regarding a ceiling-height issue. Defendants appeal the trial court's judgment in favor of plaintiffs on certain breach-of-contract and consumer-fraud claims, the award of nominal damages in favor of plaintiffs on the consumer-fraud counts regarding the ceiling-height issue, punitive damages, and attorney fees. We affirm.

Plaintiffs filed their original 16-count complaint against defendants in May 2000, alleging breach of contract, bad-faith breach of contract, common-law fraud, and violations under the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 et seq. (West 1996)), relating to plaintiffs' purchases of luxury condominium units in Glen Ellyn. The matter eventually proceeded to trial on plaintiffs' third amended complaint alleging breach of contract, common-law fraud, and violations of the Consumer Fraud Act. Following a four-day bench trial, the trial court found for plaintiffs on their claims for breach of contract and consumer fraud, but found that plaintiffs failed to present a reasonable basis for calculating damages and, thus, awarded plaintiffs only nominal damages of $100 each. Further, the trial court awarded plaintiff Kirkpatrick $15,865 on his claim for breach of contract relating to his custom master bathroom. The trial court also found in found in favor of defendants and against plaintiff Smith on his claim relating to his need to recut his cabinetry and millwork. The trial court subsequently awarded plaintiffs $83,000 in attorney fees and $300,000 in punitive damages.

Defendant Morningside Development Group, Inc. (Morningside), is an Illinois corporation and general partner of defendant Glen Astor Condominium Investors, L.P. (Glen Astor), which is an Illinois limited partnership engaged in the construction of residential real estate in Glen Ellyn. Defendant David Strosberg is the president of Morningside. Plaintiffs entered into written purchase agreements with defendant Glen Astor for the purchase of luxury condominium units on the top floor of a six-floor condominium project known as Glen Astor Condominiums in Glen Ellyn, which agreements were executed in 1996 and 1997 and closed between August and December of 1997.

Plaintiffs alleged that, prior to entering into the written purchasing agreements, they reviewed sales brochures with copies of various floor plans indicating the square footage of their unit choices and also indicating that the units had nine-foot ceilings. Plaintiffs Kirkpatrick, Smith, and Sentowski testified that defendant Strosberg told them that their units would be constructed with nine-foot ceilings. After plaintiffs purchased their condominiums, they discovered that their units were not of the promised square footage and that their ceilings were only 8 feet 6 inches high. Further, plaintiffs testified that they reviewed floor plans that, in the cases of plaintiffs Caldwell, Smith, and Sentowski, were attached to and made a part of their contracts indicating the total square footage of their respective units. However, the total square footage of the finished units was less than the promised figures. Plaintiffs< expert appraiser, David Philips, testified to the exact deficiencies noted in his reports, which contained detailed measurements and calculations. Philips< report was ultimately entered into evidence at trial without objection.

Each of the written agreements contained the following language:

"5. Seller Improvements: a. Seller shall improve the parcel with a residential building including the premises substantially in accordance with the plans and specifications for the

premises by Daniel LeNoble and Associates on file in Seller's Office ('architect's plans'), subject to change orders entered into by buyer and seller on Rider B after the date hereof, if any, and any specifications attached hereto as Rider D."

Rider B contained the following language:

"All dimensions on the attached marked-up floor plan dated _____ are approximate and subject to adjustments due to the actual location of piping, electrical, studs, steel bar joists, and other building components."

Defendants established that representations of ceiling height and square footage were based upon the architectural plans prepared by Daniel LeNoble and Associates, Inc., working within the parameters approved by the Village of Glen Ellyn.

Daniel LeNoble and Associates, Inc., prepared architectural drawings for a six-story building with each unit to have a ceiling height of approximately 8 feet 11 inches. During construction it was discovered that there was insufficient room to provide for 8-foot-11-inch ceilings on the top floor (all plaintiffs' units) of the condominium, due to the space required for the roof components. As a result, defendants' building superintendent, Michael Cucka, decided to lower the ceiling heights on the top floor by five or six inches.

Plaintiff Kirkpatrick also contracted defendants' architect Daniel LeNoble to design a custom master bath to be constructed by defendants in his unit. During construction of the sixth-floor units, Cucka learned that LeNoble's drawing failed to correctly indicate the mechanical components running through the chase (a hollow column running through the building and extending into the rooms) of the building. As a result, Kirkpatrick's bathroom had to be reconfigured at a cost of $31,730.

Plaintiff Smith also alleged breach of contract against defendants regarding custom kitchen millwork and cabinets that, because of the lower ceiling, had to be recut in order to fit. Smith testified that he relied on floor plans from defendants, which stated that the ceilings were nine feet high, to plan his custom kitchen millwork and cabinets. After cutting the wood for the millwork and cabinets, Smith took field measurements and discovered that the ceilings in his unit were only 8 feet 6 inches high. His millwork and cabinets had to be recut at a cost of $24,115.

On the issue of square footage, the trial court heard the testimony of each plaintiff; defendant David Strosberg; master appraisers Douglas Adams and David Philips; and architects Richard Cook and Daniel LeNoble.

Philips testified that his method of measuring the square footage of the units was the "paint-to-paint" method, which measured square footage from inside wall to inside wall. This method resulted in a smaller square footage than the method used by LeNoble. LeNoble testified that he measured from the outside wall to half of the demising wall, which is a commonly accepted way of calculating square footage.

The trial court determined that the difference in square footage was in fact due to a difference in measuring methodology and that the method used by LeNoble was appropriate and proper. The square footage dimensions depicted on the floor plans were exactly what each plaintiff received and, accordingly, the trial court denied plaintiffs' breach-of-contract, common-law-fraud, and Consumer Fraud Act claims regarding square footage.

The trial court also determined that plaintiff Kirkpatrick was entitled to damages relating to his master bathroom and that said damages should be apportioned 50% to the architect, Daniel

LeNoble, as Kirkpatrick's agent, and 50% to defendant Glen Astor. Accordingly, the trial court awarded Kirkpatrick $15,865.

The trial court found that plaintiff Smith's claim for damages relating to recutting custom millwork due to the ceiling height was barred by the contractual language that required that he make field measurements prior to ordering materials. The contract between plaintiff Smith and defendants stated in Rider B:

"9. Seller shall not be required to review Buyer's architectural plans for the Buyer's improvements, and Seller shall not oversee Buyer's work on the premises. Seller makes no warranty whatsoever to Buyer that the premises and its components are complete or compatible with the Buyer's improvements. Buyers understand that all dimensions on the Seller's plans and specifications are approximate and subject to modification for actual field conditions. Field measurement is required to conform dimensions prior to ordering materials."

As to plaintiffs' breach-of-contract claims regarding the lower ceilings, the trial court found that there was a breach of contract in that the contracts provided for approximately 8-foot-11-inch ceilings, that plaintiffs received 8-foot-8-inch ceilings, and that, therefore, there were actual damages. The trial court stated that defendants< expert, Douglas Adams, was not credible. As to the issue of damages, the only evidence presented by plaintiffs at trial was that of the real estate appraiser, David Philips. Philips indicated that he had compiled records regarding hundreds of comparable condominium units and that, in his opinion, as of October 1, 2004, plaintiffs' units had a diminished value of 5% by having only 8-foot-6-inch or 8-foot-7-inch ceilings instead of 9-foot ceilings. The trial court determined that Philips' testimony of diminished value due to lower ceilings did not relate to

the date of the breach, which occurred in 1997, and that his percentage calculation of diminished value seven years after the breach was nothing more than a guess without a proper basis. Thus, the trial court awarded plaintiffs $100 each in nominal damages with regard to their breach-of-contract claims relating to the lower ceilings.

Regarding plaintiffs' Consumer Fraud Act claims based on the lower ceilings, the trial court determined that plaintiffs proved their claims, including actual damages, but that Philips' testimony regarding the amount of actual damages was insufficient to support a computation of damages. Accordingly, the trial court awarded plaintiffs $100 each in nominal damages, which represented the same $100 awarded under the breach-of-contract claims. The trial court also awarded $300,000 in punitive damages and $83,000 in attorney fees under the Consumer Fraud Act.

Plaintiffs appealed the trial court's judgment in favor of defendants on the common-law-fraud claim, breach-of-contract square-footage claim, consumer-fraud square-footage claim, and Smith (cabinet/millwork) breach-of-contract claim. Plaintiffs also appealed the trial court's award of only nominal damages for the ceiling-height issue and only half of Kirkpatrick's damages on his breach-of-contract claim regarding his custom master bathroom. Defendants appealed the trial court's award of nominal damages, punitive damages, and attorney fees to plaintiffs on their consumer-fraud claim relating to ceiling height, as well as the trial court's finding of breach of contract relating to ceiling height and Kirkpatrick's breach-of-contract claim.

Initially we address defendants' motion to strike portions of plaintiffs' reply brief, namely, arguments that plaintiffs failed to raise in their original brief. We grant defendants' motion and will not address arguments plaintiffs raised for the first time in their reply brief, because they are waived. See 188 Ill. 2d R. 341(e)(7).

We now address the merits of the case. There are 13 issues raised on appeal by plaintiffs and defendants: (1) plaintiffs argue that the trial court erred by finding that defendants were not liable for common-law fraud and consumer fraud relative to misrepresentations contained in the sales brochures and price lists regarding the square footage of plaintiffs' units; (2) plaintiffs argue that the trial court erred by finding for defendants on plaintiffs' breach-of-contract claim based on the floor plans attached to the sales contracts; (3) plaintiffs argue that the trial court erred when it failed to conform the judgment to the allegedly undisputed proofs and award a judgment for damages to plaintiffs based upon the valuation evidence of their expert, David Philips, regarding the breach-of-contract claims and consumer-fraud claims relating to the ceiling-height issue; (4) defendants argue that the trial court erred by finding for plaintiffs on the ceiling-height issue, because the contracts did not specify any particular ceiling height; (5) defendants also argue that Rider B barred any breach-of-contract claim regarding ceiling height; (6) plaintiffs argue that the trial court erred by awarding plaintiffs only nominal damages; (7) defendants contend that the trial court was precluded from awarding nominal damages because plaintiffs failed to prove actual damages as required under the Consumer Fraud Act; (8) defendants contend that the trial court erred by awarding punitive damages, because they were accompanied by only nominal damages; (9) defendants argue that the amount of punitive damages is grossly excessive; (10) plaintiff Kirkpatrick argues that the trial court erred when it reduced his damages for defendants' breach of contract relative to the construction of Kirkpatrick's master bath unit; (11) plaintiff Smith argues that the trial court erred when it disregarded evidence that defendants orally waived their notice provision with respect to Smith's custom cabinetry millwork; (12) defendants argue that the trial court erred by granting plaintiffs attorney fees; and (13) defendants challenge the amount of attorney fees.

1. Square Footage of Plaintiffs' Units

Plaintiffs argue that the trial court erred by finding that defendants were not liable for common-law fraud and violations of the Consumer Fraud Act, relative to the misrepresentations contained in the sales brochures and price lists regarding the square footage of plaintiffs' units. Plaintiffs contend that the square footage represented in defendants' price lists and brochures included common elements of the condominium development and not measurements for the individual units, artificially inflating the square footage of each unit.

The elements of common-law fraud are: (1) a false statement of a material fact; (2) the defendant's knowledge that the statement was false; (3) the defendant's intent that the statement induce the plaintiff to act; (4) the plaintiff's reliance upon the truth of the statement; and (5) the plaintiff's damages resulting from reliance on the statement. Capiccioni v. Brennan Naperville, Inc., 339 Ill. App. 3d 927, 933 (2003).

The elements of a claim under the Consumer Fraud Act are: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct involving trade and commerce; and (4) actual damage to the plaintiff (5) proximately caused by the deception. Capiccioni, 339 Ill. App. 3d at 933; see 815 ILCS 505/1 et seq. (West 1996).

In a bench trial, the trial court must weigh the evidence and make findings of fact. A reviewing court will not disturb the court's findings unless they are against the manifest weight of the evidence. Eychaner v. Gross, 202 Ill. 2d 228, 251 (2002). The court's conclusions of law are reviewed de novo. Eychaner, 202 Ill. 2d at 252.

In this case, the trial court heard conflicting evidence. Plaintiffs' witness, Philips, testified that the correct method was to measure from paint to paint in each unit. Defendants' witness, architect LeNoble, testified that the correct and industry-accepted method was to measure from the exterior wall to half of the opposing wall. LeNoble testified:

"Q. Are there different methods of calculating square footage of condominium units?

A. Well, it depends. Everybody works differently. I take the entire outside wall and half of the demising wall.

Q. Why do you do that?

A. Because that's the way I have been doing it forever. I think that's the only fair way to do it."

Both David Strosberg and LeNoble testified that the method LeNoble used was acceptable within the construction industry. Further, there was no evidence that the square footage of plaintiffs' units, when measured by the method used by LeNoble, was different from that as represented on the floor plans in any of defendants' written materials. Accordingly, the trial court's finding that defendants did not make a false statement of material fact and did not engage in a deceptive act is not against the manifest weight of the evidence. Thus, we find no error in the trial court's finding in favor of defendants on the common-law-fraud and consumer-fraud claims regarding square footage.

Plaintiffs make much of the fact that LeNoble's certification was not on the plans as advertised. However, we fail to see how this amounts to a material fact or how it induced plaintiffs to purchase the condominiums. The trial court heard this testimony and did not find that it was sufficient to establish common-law fraud or consumer fraud. We will not substitute our judgment for that of the trial judge as to the credibility of expert witnesses and conflicts in their testimony. See

Samour Inc. v. Board of Election Commissioners of the City of Chicago, 224 Ill. 2d 530, 548 (2007). After reviewing the record and giving deference to the court's determination of the credibility of the witnesses and the weight to be given to the evidence, we do not believe that this finding is against the manifest weight of the evidence.

2. Contract Regarding Square Footage

Plaintiffs argue that the trial court erred by finding for defendants on plaintiffs' breach-of-contract claim based on the floor plans attached to the sales contracts. Plaintiffs contend that the evidence established that the floor plans attached to their sales contracts displayed floor plans of units that were larger than the units they actually received. However, plaintiffs ignore that Rider B, included within each party's written purchase agreement, provided in pertinent part:

> "All dimensions on the attached marked-up floor plan dated ____ are approximate and subject to adjustments due to the actual location of piping, electrical, studs, steel bar joists, and other building components."

Further, LeNoble's plans were incorporated into each contract through paragraph 5(a) of the agreement, which stated:

> "Seller shall improve the parcel with a residential building including the premises substantially in accordance with the plans and specifications for the premises by Daniel LeNoble and Associates on file in Seller's office ('architect's plans'), subject to change orders entered into by buyer and seller on Rider B after the date hereof, if any, and any specifications attached hereto as Rider D."

Because the contract contained provisions that declared any measurements as approximates, the trial court's finding that defendants did not breach the contracts was not against the manifest weight of the evidence.

### 3. Damages Regarding Ceiling-Height Issue

Next, regarding the ceiling-height issue, plaintiffs argue that the trial court erred when it failed to conform its judgment to the proofs and award a judgment for damages to plaintiffs based upon the valuation evidence of Philips, a real estate appraiser, regarding the breach-of-contract and consumer-fraud claims.

When a contract is breached, the injured party is entitled to be placed in the position he would have been in had the contract been performed. Wilson v. DiCosola, 352 Ill. App. 3d 223, 225 (2004). In proving damages, the burden is on the plaintiff to establish a reasonable basis for computing damages. Razor v. Hyundai Motor America, 222 Ill. 2d 75, 107 (2006). Thus, damages must be proved with reasonable certainty and cannot be based on conjecture or speculation. Razor, 222 Ill. 2d at 107. However, absolute certainty with regard to damages is not required. Prairie Eye Center, Ltd. v. Butler, 329 Ill. App. 3d 293, 302 (2002). Damages, in a breach of contract for the sale of real estate, are calculated by the difference between the fair market value of the real estate on the day of the breach and the sale price contracted for by the purchasers. Lakshman v. Vecchione, 102 Ill. App. 3d 629, 634 (1981).

In this case, plaintiffs' damages expert, David Philips, testified regarding hundreds of properties. After considering his research, he opined that there was a 5% difference in fair market value between the plaintiffs' units with the lower ceilings and the comparables that had nine-foot ceilings. Philips testified that his comparables were from 2004. However, plaintiffs' units closed in

1997. Therefore, the trial court disregarded Philips' 5% difference in fair market value as speculative. The trial court did not believe that a figure from seven years after the breach represented fair market value. See Lakshman, 102 Ill. App. 3d at 634. Because there was a seven-year difference between the sale of plaintiffs' units and Philips' comparables, we cannot say that the trial court's finding was against the manifest weight of the evidence regarding damages.

### 4. Contract Regarding Ceiling Height

Defendants argue that the trial court erred in finding for plaintiffs on the ceiling-height issue, because the contracts did not specify any particular ceiling height. Defendants essentially argue that, because the contracts did not specify any particular ceiling height, defendants did not engage in deceptive practices or acts. However, defendants ignore the fact that the trial court found that their advertising materials contained misrepresentations that the ceilings would be nine feet high and that these advertising materials induced plaintiffs to sign the sales contracts, thus forming the basis for the Consumer Fraud Act violations. The contracts referred to architectural drawings, which defendants contend did not show any ceiling height for plaintiffs' sixth-floor units. However, they did show ceiling heights for the other floors, which the trial court reasonably could have referred to in determining the requirements of the contracts. Therefore, we find that the trial court's finding was not against the manifest weight of the evidence.

### 5. Rider B and Ceiling Height

Defendants also argue that Rider B barred any breach-of-contract claim. Rider B stated that "All dimensions on the attached marked-up floor plan dated _____ are approximate and subject to adjustment due to the actual location of piping, electrical studs, steel bar joists, and other building components." Implicit in every contract is a duty of good faith and fair dealing; this obligation

-13-

requires a party vested with contractual discretion to exercise it reasonably, and further he may not do so arbitrarily, capriciously, or in a manner inconsistent with reasonable expectations of parties. Diamond v. United Food & Commercial Workers Union Local 881, 329 Ill. App. 3d 519, 526-27 (2002). In this case, the trial court reasonably determined that an alteration from 9-foot ceilings to 8-foot-6-inch ceilings was an unreasonable alteration and not covered by Rider B. We cannot say that this finding was against the manifest weight of the evidence. Therefore, defendants' argument fails.

### 6. Award of Only Nominal Damages

Plaintiffs argue that the trial court erred by awarding plaintiffs only nominal damages. If a party proves a right to damages in a fraud claim but fails to provide a proper basis for computing those damages, a court may award only nominal damages. Giammanco v. Giammanco, 253 Ill. App. 3d 750, 758 (1993). In this case, plaintiffs failed to provide a proper basis to compute their damages, because their expert provided comparables that were seven years after the sale of plaintiffs' units and referenced the damages as of 2004, not 1997. Thus, it was not unreasonable to find the evidence speculative or otherwise insufficient. Therefore, the trial court's decision to award only nominal damages was not against the manifest weight of the evidence.

### 7. Nominal Damages Absent Award of Actual Damages

Defendants contend that the trial court was precluded from awarding nominal damages because plaintiffs failed to prove actual damages as required under the Consumer Fraud Act. See Oliveira v. Amoco Oil Company, 201 Ill. 2d 134, 149 (2002); see also 815 ILCS 505/2 (West 1996). However, defendants ignore the fact that, although plaintiffs' evidence of damages seven years after the fact was deficient, the trial court made a specific finding of fact that plaintiffs did indeed prove

actual damages for the purpose of proving their consumer-fraud claims. Therefore, defendants' argument fails.

The cases cited by defendants to support their argument are factually distinguishable from the case at bar. In neither Petty v. Chrysler Corp., 343 Ill. App. 3d 815 (2003), nor Tolve v. Ogden Chrysler Plymouth, 324 Ill. App. 3d 485 (2001), were there specific findings of actual damages. In those cases, there were no findings of actual damages at all. In contrast, in this case, the trial court made a specific finding that plaintiffs suffered actual damages. Thus, Petty and Tolve do not apply.

8. Punitive Damages and Award of Only Nominal Damages

Defendants also contend that the trial court erred by awarding punitive damages where they were accompanied by only nominal damages and in the absence of an award of actual damages. We first look to the Consumer Fraud Act to address this issue.

Our primary goal in construing a statute is to ascertain and give effect to the intent of the legislature. People v. Cherry Valley Public Library District, 356 Ill. App. 3d 893, 895-96 (2005). The best indicator of that intent is the plain language of the statute itself. Cherry Valley Public Library District, 356 Ill. App. 3d at 896. Statutory construction is a question of law; therefore, our review is de novo. Cherry Valley Public Library District, 356 Ill. App. 3d at 895.

The Consumer Fraud Act is a regulatory and remedial statute intended to give broad protection to consumers, borrowers, and business people against fraud, unfair methods of competition, and other unfair and deceptive business practices. Ramirez v. Smart Corp., 371 Ill. App. 3d 797, 805 (2007). The Consumer Fraud Act itself indicates that "any person who suffers actual damage" may be awarded punitive damages. See 815 ILCS 505/10a(a) (West 1996).

Section 10a(a) of the Consumer Fraud Act provides in relevant part:

"(a) Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court in its discretion may award actual economic damages or any other relief which the court deems proper." 815 ILCS 505/10a(a) (West 1996).

However, courts should award punitive damages in Consumer Fraud Act cases only for conduct that is outrageous, either because the defendant's motive was evil or the acts showed a reckless disregard of others' rights. Totz v. Continental Du Page Acura, 236 Ill. App. 3d 891, 909 (1992). The purpose of awarding punitive damages is to punish the wrongdoer and, in doing so, to deter that party and others from committing similar wrongful acts. Totz, 236 Ill. App. 3d at 909. Punitive damages are not favored in the law; thus, courts should be careful never to award such damages improperly or unwisely. Kleidon v. Rizza Chevrolet, Inc., 173 Ill. App. 3d 116, 121 (1988). "In reviewing a decision on punitive damages, an appellate court must not disturb the trial court's decision unless the trial court abused its discretion." Kleczek v. Jorgensen, 328 Ill. App. 3d 1012, 1024-25 (2002). A trial court abuses its discretion only if no reasonable person could agree with the position of the trial court. Matthews v. Avalon Petroleum Co., 375 Ill. App. 3d 1, 9 (2007).

Further, in common-law cases, Illinois courts have allowed punitive damages supported only by nominal damages when the conduct of the defendant is intentional. See, e.g., In re Estate of Hoellen, 367 Ill. App. 3d 240, 252 (2006) (holding that punitive damages can be awarded for intentional breach of fiduciary duty without an award of actual damages); First National Bank of Des Plaines v. Amco Engineering Co., 32 Ill. App. 3d 451, 455 (1975) (remanding for award of nominal damages for trespass to property and allowing plaintiffs to amend complaint to seek punitive damages), superseded by statute on other grounds as recognized by Wujcik v. Gallagher & Henry

Contractors, 232 Ill. App. 3d 323, 328 (1992); Pratt v. Davis, 118 Ill. App. 161, 181-82 (1905) (holding that punitive damages can be given for medical battery even though a plaintiff's loss is nominal); McNay v. Stratton, 9 Ill. App. 215 (1881) (holding that punitive damages can be awarded in an action for false imprisonment without proof of actual damages).

Here, the trial court held a full evidentiary hearing on punitive damages and, then, granted relief. It does not appear that the trial court abused its discretion. The court found that defendants' deceptive or fraudulent conduct was the result of an evil motive or undertaken with a reckless disregard for the rights of others. Defendants' attempts to convince us otherwise are unavailing.

Cucka, the building superintendent, testified that he told Strosberg, the president of Morningside, at least one year before plaintiffs' sales contracts closed, that the ceilings would be only 8 feet 6 inches or 8 feet 8 inches high and not 9 feet high as promised, both orally and in the advertising brochures. When Cucka told Strosberg this information, Strosberg did not tell plaintiffs about this change in ceiling height; Strosberg said that it was not important and that it was just a "marketing type of situation." Strosberg testified that his marketing brochures and all other marketing materials such as newspaper advertisements and marketing signs outside the property represented that the ceilings were nine feet high. Strosberg admitted that nine-foot ceilings were at least one factor that attracted buyers to buy the Glen Astor condominiums. Just before plaintiffs closed their sales contracts, Strosberg finally changed the sales brochures to state that the ceilings were only 8 feet 7 inches high, but he never told plaintiffs about the change. This provides ample circumstantial evidence that defendants' actions were intentional. The fact that Strosberg presented an innocent version of these events during his testimony does not alter the fact that we are to give deference to the trial court's resolution of credibility. It was reasonable for the trial court to conclude that actions

speak louder than words. The trial court's finding that the misrepresentation was intentional is not against the manifest weight of the evidence. Therefore, the trial court did not abuse its discretion by awarding plaintiffs punitive damages.

Defendants cite Avery v. State Farm Mutual Automobile Insurance Co., 216 Ill. 2d 100 (2005), Oliveira v. Amoco Oil Co., 201 Ill. 2d 134 (2002), Petty v. Chrysler Corp., 343 Ill. App. 3d 815 (2003), Hayman v. Autohaus on Edens, Inc., 315 Ill. App. 3d 1075 (2000), and B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 76 F. Supp. 2d 868 (N.D. Ill. 1999), to support their contention that plaintiffs must establish actual damages to recover punitive damages under the Consumer Fraud Act. However, in none of the cases cited by defendants did the courts make specific findings of actual damages. In contrast, the trial court in this case made a specific finding of actual damages. Keeping in mind that section 10a(a) requires only that a plaintiff prove that he suffered actual damages and does not expressly require the plaintiff to prove the amount of actual damages, we determine that Avery, Oliveira, Petty, Hayman, and B. Sanfield are factually distinguishable from the case at bar and that nothing in section 10a(a) prohibits the award of nominal and punitive damages here. See 815 ILCS 505/10a(a) (West 1996).

Although not raised by defendants, we distinguish Smith, Allen, Mendenhall, Emons & Selby v. Thomson Corp., 371 Ill. App. 3d 556 (2006). In Smith, Allen, the Fifth District Appellate Court held that the plaintiff could not recover punitive damages for allegedly excessive shipping and handling charges added to CD-ROMs it received, because a witness for the plaintiff testified that, each time he received a CD-ROM, he made a cost-benefit decision to accept the charge. Smith, Allen, 371 Ill. App. 3d at 560. Therefore, the plaintiff failed to prove actual damages. Accordingly, the plaintiff failed to establish a cause of action under the Consumer Fraud Act. Smith, Allen, 371

Ill. App. 3d at 560. This case is distinguishable because the trial court in this case expressly found that plaintiffs proved actual damages.

### 9. The Amount of Punitive Damages

Defendants argue that the amount of punitive damages is so grossly excessive as to violate the due process clause of the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV).

The due process clause of the fourteenth amendment "prohibits a State from imposing a ' "grossly excessive" ' punishment on a tortfeasor. [Citation.]" BMW of North America, Inc. v. Gore, 517 U.S. 559, 562, 134 L. Ed. 2d 809, 812, 116 S. Ct. 1589, 1592 (1996). In considering whether an award of punitive damages is grossly excessive, the trial court must consider the following factors: (1) the reprehensibility of the defendant's conduct; (2) the disparity between the actual damages or harm incurred by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages and civil penalties imposed in comparable cases. Gore, 517 U.S. at 575, 134 L. Ed. 2d at 826, 116 S. Ct. at 1598-99. We review de novo the issue of whether punitive damages were unconstitutionally awarded. International Union of Operating Engineers, Local 150 v. Lowe Excavating Co., 225 Ill. 2d 456, 469 (2006).

As to the first factor, the reprehensibility of the defendant's conduct, the United States Supreme Court in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 419, 155 L. Ed. 2d 585, 602, 123 S. Ct. 1513, 1521 (2003), instructs us to consider the following factors when determining reprehensibility: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to, or a reckless disregard for, the health and safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the

conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, deceit, or mere accident.

In this case, although the harm was purely economic and no one was physically endangered, defendants engaged in trickery and deceit by intentionally misrepresenting the ceiling heights of their condominium units to induce plaintiffs to purchase their properties. Defendants had at least one year to inform plaintiffs about the ceiling-height discrepancy. Instead, they did not inform plaintiffs and allowed the sales contracts to close. Defendants repeated this conduct no fewer than four times. The trial court found that defendants acted in bad faith and "concocted an elaborate and false story in order to try to prop up the defense that no deception was practiced upon them the Plaintiffs [sic]." After reviewing the record, we believe that this finding was not against the manifest weight of the evidence.

With regard to the second Gore guidepost, the disparity between the actual damages suffered by the plaintiff and the amount of the punitive damages award, the Illinois Supreme Court has been reluctant to identify concrete constitutional limits on the ratio between the harm to the plaintiff and the punitive damages award. However, our supreme court has encouraged trial courts to award punitive damages not exceeding a single-digit ratio in comparison to actual damages. Lowe Excavating, 225 Ill. 2d at 487. Further, minimal compensatory damages may be too slight to give the victim an incentive to sue and may be insufficient to deter and punish the defendant. Lowe Excavating, 225 Ill. 2d at 489. In addition, we note that, especially in this case, "we are permitted to take into account the amount of the attorney fees expended in a case when assessing a punitive damages award." Lowe Excavating, 225 Ill. 2d at 490. We also may consider the need to punish and deter defendants' bad conduct. Lowe Excavating, 225 Ill. 2d at 489. "[L]ow compensatory damages

awards may support higher ratios where a particularly egregious act has resulted in a small amount of economic damage, or where an injury is hard to detect and the harm is difficult to determine." Lowe Excavating, 225 Ill. 2d at 487. The best method to determine whether a given ratio is appropriate is to compare it to punitive damages awards in similar cases. Lowe Excavating, 225 Ill. 2d at 487. We are unaware of similar cases considering the Lowe criteria, especially where nominal damages and attorney fees were awarded. However, this district recently considered a fraudulent auto lease in the context of the Consumer Fraud Act. In Gehrett v. Chrysler Corp., 379 Ill. App. 3d 162 (2008), we upheld a ratio of 7 to 1.

In this case, although no compensatory damages were awarded, $83,000 in attorney fees and $300,000 in punitive damages were awarded, making the ratio of punitive damages just over 3½ times attorney fees, well within the range permitted by Lowe Excavating and Gehrett.

We discuss the third factor to be considered to determine whether an award of punitive damages is grossly excessive; that is, the difference between the punitive damages and civil penalties imposed in comparable cases. See Gore, 517 U.S. at 575, 134 L. Ed. 2d at 826, 116 S. Ct. at 1598-99. The purpose of this third factor is to " 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.' " Gore, 517 U.S. at 583, 134 L. Ed. 2d at 831, 116 S. Ct. at 1603, quoting Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301, 106 L. Ed. 2d 219, 254, 109 S. Ct. 2909, 2934 (1989) (Brennan, J., concurring, joined by Marshall, J.). Section 7 of the Consumer Fraud Act authorizes the imposition of a civil penalty of up to $50,000 per violation when relief is sought by the Illinois Attorney General or a State's Attorney. 815 ILCS 505/7 (West 1996). Thus, considering that defendants committed

numerous violations of the Act, we cannot say that $300,000 in punitive damages is grossly excessive in light of this third factor.

Because all three of the Gore factors weigh in favor of the trial court's award of $300,000 in punitive damages, we determine that the award is not grossly excessive and does not violate due process.

### 10. Kirkpatrick's Master Bath Unit Damages

Next, plaintiff John Kirkpatrick argues that the trial court erred when it reduced his damages for defendants' breach of contract relative to the construction of Kirkpatrick's master bath unit.

When there has been a breach of contract based upon defective workmanship, the general measure of damages is the cost of repairing the defects and/or completing the project. Arch of Illinois, Inc. v. S.K. George Painting Contractors, Inc., 288 Ill. App. 3d 1080, 1082 (1997).

In this case, the trial court found that defendants breached the contract by failing to perform in a workmanlike manner. However, the cost of rebuilding the master bathroom was not completely attributable to defendants, because plaintiff Kirkpatrick's agent, LeNoble, drafted defective plans, which were followed by defendants. Therefore, the trial court did not attribute the full amount of the $31,730 repair to defendants. Instead, the damages were split between Kirkpatrick and defendants. Contrary to Kirkpatrick's contention, the trial court did not apply comparative fault; the computed damages were based upon defendants' breach. The trial court found that, before defendants started building the master bathroom, they had an obligation to tell LeNoble that they could not build it based on his plan and to ask LeNoble to redraft the plan to save costs. Because defendants failed to do this, the trial court found that the parties were mutually responsible for the cost of the repair. After reviewing the record, we cannot say that this was against the manifest weight of the evidence.

### 11. Smith's Millwork Damages

Plaintiff William Smith argues that the trial court erred when it disregarded evidence that defendants orally waived their notice provision with respect to Smith's custom cabinetry millwork. Smith contends that, although his contract obligated him to obtain field measurements, defendants waived this requirement when their construction manager asked Smith to order bathroom and lighting fixtures before taking field measurements. However, the trial court was free to find that Rider B, section 9, which provided, in part, that "[f]ield measurement[s] [are] required to confirm dimensions prior to ordering materials," prevailed over any conversation Smith may have had with defendants or defendants' agents regarding bathroom and lighting fixtures. The request of the building manager was equivocal, and it was not established that the manager was authorized to orally amend the contract between the parties. We cannot say that the trial court's ruling was against the manifest weight of the evidence or that it was manifestly erroneous on a mixed question of law and fact.

### 12. Award of Attorney Fees

Next, defendants argue that the trial court erred by granting plaintiffs attorney fees. The decision whether to award attorney fees to the prevailing party in a consumer-fraud case rests within the sound discretion of the trial court. Ciampi v. Ogden Chrysler Plymouth, Inc., 262 Ill. App. 3d 94, 114 (1994). Although defendants argue that plaintiffs were not the prevailing party, we disagree. In Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources, 532 U.S. 598, 149 L. Ed. 2d 855, 121 S. Ct. 1835 (2001), the Court held that a "prevailing party" is one who has been awarded some relief by the court. See also J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership, 325 Ill. App. 3d 276, 280 (2001) (holding that a party that receives judgment in his favor is usually considered the prevailing party). In this case, plaintiffs established

a cause of action under the Consumer Fraud Act and were awarded nominal damages. Thus, plaintiffs were the prevailing party.

Among the factors the trial court may consider in deciding whether to award attorney fees are: the degree of the opposing party's bad faith; the opposing party's ability to satisfy the fee award; the deterrent value of the fee award; whether the party requesting the fees sought to benefit all consumers or businesses or to resolve a significant legal issue under the Consumer Fraud Act; and the relative merits of the parties' positions. Majcher v. Laurel Motors, Inc., 287 Ill. App. 3d 719, 730 (1997).

The trial court essentially found that defendants acted in bad faith repeatedly; they intentionally misrepresented the height of the ceilings prior to closing on the contracts and they "concocted an elaborate and false story in order to prop up the defense that no deception was practiced upon the Plaintiffs," lied about the cause of the lower ceilings, and destroyed the construction logs. The trial court also found that defendant earned millions of dollars from the Glen Astor Condominium project and had a net worth of many millions of dollars. In light of these findings we cannot say that the trial court abused its discretion by granting plaintiffs attorney fees.

13. Calculation of Attorney Fees

Lastly, defendants challenge the amount of attorney fees, claiming that the fees were not supported by proper evidence because plaintiffs' attorney did not keep detailed time slips; instead, he estimated the time he spent on the Consumer Fraud Act issue.

A court of review may not reverse an award of attorney fees merely because it might have reached a different conclusion. Cretton v. Protestant Memorial Medical Center, Inc., 371 Ill. App. 3d 841, 868 (2007). In order to alter a fee allowance made by a trial court, the court of review must determine that the trial court abused its discretion. United States Fidelity & Guaranty Co. v. Old

Orchard Plaza Ltd. Partnership, 333 Ill. App. 3d 727, 740 (2002).  A trial court must determine whether the party seeking attorney fees has met its burden of presenting sufficient evidence from which the court can render a decision as to the amount of reasonable attorney fees; such a determination necessarily involves a weighing of facts, such as the type of fee arrangement at issue, the amount of hours worked, and the hourly fees charged.  Pietrzyk v. Oak Lawn Pavilion, Inc., 329 Ill. App. 3d 1043, 1046 (2002).  Evidence of the actual number of hours spent by the attorney is relevant, but the failure of the attorney to keep time records does not negate the reasonableness of the fee award.  In re Estate of Settle, 97 Ill. App. 3d 552, 555 (1981).  The trial court is permitted to use its own knowledge and experience to assess the time required to complete particular activities. Cretton, 371 Ill. App. 3d at 868.  The trial court can also consider whether it observed the progression of the case and the research involved.  Cabrera v. First National Bank of Wheaton, 324 Ill. App. 3d 85, 104 (2001).  We are also reminded of the Consumer Fraud Act's explicit requirement that it be liberally construed to effect its purpose.  See Cuculich v. Thompson Consumer Electronics, Inc., 317 Ill. App. 3d 709, 716 (2000).  Allowing plaintiffs to recover fees and costs incurred during trial is consistent with the statutory mandate to provide appropriate remedies to defrauded consumers.  Chesrow v. Du Page Auto Brokers, Inc., 200 Ill. App. 3d 72, 76 (1990).

Plaintiffs' counsel filed an affidavit with his petition for attorney fees stating that he was employed through a contingent fee agreement.  Thus, to the extent that time slips were prepared for many of the services rendered, they did not differentiate between the breach-of-contract, common-law-fraud, and consumer-fraud claims.  However, as attested to by plaintiffs' counsel in his deposition, the breach-of-contract claims required little time except the crafting of the pleadings themselves.  This was so because plaintiffs knew from measuring their ceilings and their units, before litigation began,

that the ceilings were short of the nine feet promised and that the square footage was less than promised. Therefore, plaintiffs' counsel spent practically no time on the breach-of-contract claims. Further, regarding the common-law-fraud claims, the time expended in gathering the proofs was virtually the same as that needed for the consumer-fraud claims. Plaintiffs' counsel testified that virtually all of the work in this case involved the consumer-fraud claims. Plaintiffs' attorney accounted for his time with time slips as well as he could and presented them to the court. Plaintiffs' attorney allocated 70% (279 hours) of the time spent on this case to the consumer-fraud claims. This time, plus costs, amounted to $83,000. Plaintiffs' counsel testified that this percentage was arrived at by excluding specific time slips unrelated to the consumer-fraud claims and excluding all of the time associated with amended pleadings and various summary judgment motions and motions to dismiss. Plaintiffs' counsel repeatedly testified that he gave the benefit of the doubt to defendants. Due to the nature of the fee arrangement, plaintiffs' file was substantially underbilled because many services performed, such as court appearances and the writing of pleadings, were accomplished without the creation of time slips. Because the trial court considered the evidence, was familiar with the case and its issues, and had the benefit of observing plaintiffs' counsel throughout the proceedings, we cannot say that the trial court's award of $83,000 in attorney fees was an abuse of discretion.

Defendants cite to Chesrow, 200 Ill. App. 3d 72, to support their argument. However, Chesrow is factually distinguishable. In Chesrow, this court was reviewing the denial of attorney fees, whereas here we are reviewing the grant of attorney fees. Therefore, the procedural posture is different. Also, in Chesrow, the attorney was seeking fees for appellate legal work, and, therefore, the trial court did not have the benefit of observing the work of the attorney. We reasoned in Chesrow: "Because the court here was not exposed to the appellate proceedings in the same way as

it would be exposed to trial proceedings, it was reasonable for the court to insist that the petition be supported by a greater degree of independent proof." Chesrow, 200 Ill. App. 3d at 77. In this case, the trial court was exposed to the trial proceedings and had knowledge of the extent of plaintiffs' counsel's work. Thus, Chesrow is not controlling.

For these reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

HUTCHINSON and JORGENSEN, JJ., concur.